No. 26-14146

# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

CAIR-FOUNDATION, INC., et al.,

*Plaintiffs–Appellants*,

v.

RON DESANTIS, et al.,

*Defendants–Appellees*.

On Appeal from the United States District Court
for the Northern District of Florida, No. 4:26-cv-521 (Winsor, J.)

# PLAINTIFFS–APPELLANTS' TIME-SENSITIVE MOTION FOR INJUNCTION PENDING APPEAL


Ashley Gorski
Hina Shamsi
Patrick Toomey
Charles Hogle
Celin Carlo-Gonzalez
Natalie Smith
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
agorski@aclu.org

Daniel B. Tilley (FBN 102882)
**ACLU FOUNDATION OF FLORIDA**
4343 West Flagler Street, Ste. 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org

Scott D. McCoy
Aaron Fleisher
Diego A. Soto
Mary Ella W. Simmons
**SOUTHERN POVERTY LAW CENTER**
400 Washington Ave
Montgomery, AL 31604
(786) 347-2056
scott.mccoy@splcenter.org

Manoj S. "Sachin" Varghese
Mark L. Bailey
Kayla Polonsky Gannon
**BONDURANT, MIXSON & ELMORE, LLP**
1201 W. Peachtree St. NW, Ste. 3900
Atlanta, GA 30309
(404) 881-4100
varghese@bmelaw.com

*Attorneys for Plaintiffs–Appellants*

## TABLE OF CONTENTS

INTRODUCTION ........ 1

STATEMENT OF FACTS ........ 5

I. Plaintiffs' Designation ........ 5

II. Plaintiffs' Suit and Appeal ........ 9

ARGUMENT ........ 10

I. The DTO Regime and Plaintiffs' Designations Violate the First Amendment. ........ 11

- A. The DTO regime and Plaintiffs' designations violate their freedom of association. ........ 11
- B. The DTO regime and Plaintiffs' designations impose a prior restraint on their speech and association. ........ 21
- C. The DTO regime is unlawful because it vests excessive discretion in Florida's executive branch to suppress disfavored speech and association. ........ 25
- D. The DTO regime and Plaintiffs' designations fail First Amendment scrutiny. ........ 28

II. Plaintiffs Were Deprived of Due Process. ........ 30

- A. Designation is criminal punishment by another name and so requires criminal process. ........ 30
- B. Even if designation were not criminal punishment, Plaintiffs' designations violated their right to procedural due process. ........ 31

III. The remaining factors governing emergency relief weigh strongly in favor of Plaintiffs. ........ 36

CONCLUSION ........ 37

## TABLE OF AUTHORITIES

### Cases

*Afr. People's Educ. & Def. Fund, Inc. v. Pinellas Cnty.*,
184 F.4th 1194 (11th Cir. 2026) .....................................................31

*Alexander v. United States*,
509 U.S. 544 (1993).....................................................................22

**Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021)............................................................. 11, 13, 18

*Arcara v. Cloud Books, Inc.*,
478 U.S. 697 (1986)..................................................................... 20, 21

**Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963)............................................................... 21, 23, 24

*Barrett v. Walker Cnty. Sch. Dist.*,
872 F.3d 1209 (11th Cir. 2017) .....................................................21

*Bates v. City of Little Rock*,
361 U.S. 516 (1960).....................................................................14

*Bell v. City of Winter Park*,
745 F.3d 1318 (11th Cir. 2014) ................................................ 25, 26

*Bourgeois v. Peters*,
387 F.3d 1303 (11th Cir. 2004) ................................................ 23, 27

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000).....................................................................15

*CAIR Found. v. DeSantis*,
No. 26-10735 (11th Cir.) ..............................................................10

*CAIR-Found., Inc. v. DeSantis*,
No. 25-cv-516 (N.D. Fla.)..............................................................10

*Canal Auth. of Fla. v. Callaway*,
489 F.2d 567 (5th Cir. 1974) ..........................................................5

*Chiles v. Salazar*,
607 U.S. 627 (2026)........................................................................24

*Dames & Moore v. Regan*,
453 U.S. 654 (1981)........................................................................17

*Doe 1-13 By & Through Doe, Sr. 1-13 v. Chiles*,
136 F.3d 709 (11th Cir. 1998)........................................................................5

*Florida v. Dep't of Health & Human Servs.*,
19 F.4th 1271 (11th Cir. 2021)........................................................................10

*Fly Fish, Inc. v. City of Cocoa Beach*,
337 F.3d 1301 (11th Cir. 2003)........................................................................27

*Freedman v. Maryland*,
380 U.S. 51 (1965)........................................................................25

*Gonzalez ex rel. Gonzalez v. Reno*,
2000 WL 381901 (11th Cir. Apr. 19, 2000)........................................................................10

**Healy v. James*,
408 U.S. 169 (1972)........................................................................ 23, 24

**Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010)........................................................................ 3, 16, 29

*Humanitarian L. Project v. Reno*,
205 F.3d 1130 (9th Cir. 2000)........................................................................ 3, 17, 36

*In Re Shek*,
947 F.3d 770 (11th Cir. 2020)........................................................................19

*Islamic Am. Relief Agency v. Gonzales*,
477 F.3d 728 (D.C. Cir. 2007)........................................................................ 17, 36

*Jarrard v. Sheriff of Polk Cnty.*,
115 F.4th 1306 (11th Cir. 2024)........................................................................ 21, 23

**Jenkins v. McKeithen*,
395 U.S. 411 (1969)........................................................................ 33, 34

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
341 U.S. 123 (1951)....................................................................................32

*KH Outdoor, LLC v. City of Trussville*,
458 F.3d 1261 (11th Cir. 2006) ......................................................................36

*Lady J. Lingerie, Inc. v. City of Jacksonville*,
176 F.3d 1358 (11th Cir. 1999) ......................................................................26

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*,
32 F.4th 1363 (11th Cir. 2022) .......................................................................10

*League of Women Voters of N. Carolina v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) ...........................................................................5

**Mathews v. Eldridge*,
424 U.S. 319 (1976)............................................................................... 30, 31

**McCullen v. Coakley*,
573 U.S. 464 (2014)............................................................................... 14, 29

*NAACP v. Button*,
371 U.S. 415 (1963)............................................................................... 15, 24

*Nat'l Council of Resistance of Iran v. Dep't of State*,
251 F.3d 192 (D.C. Cir. 2001).........................................................................32

*Noto v. United States*,
367 U.S. 290 (1961)....................................................................................12

*NRA v. Vullo*,
602 U.S. 175 (2024)....................................................................................12

*Nutra Health, Inc. v. HD Holdings Atlanta, Inc.*,
2021 WL 5029427 (N.D. Ga. June 29, 2021)......................................................5

*Osorio v. State Farm Bank, F.S.B.*,
746 F.3d 1242 (11th Cir. 2014) ......................................................................18

*People's Mojahedin Org. of Iran v. Dep't of State*,
327 F.3d 1238 (D.C. Cir. 2003).......................................................................17

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) .......... 11

*SEC v. Jarkesy*,
603 U.S. 109 (2024) .......... 30

*Speiser v. Randall*,
357 U.S. 513 (1958) .......... 30

*TikTok Inc. v. Garland*,
604 U.S. 56 (2025) .......... 20

*Turner Broad. Sys., Inc. v. FCC*,
520 U.S. 180 (1997) .......... 28

*United States v. Afshari*,
446 F.3d 915 (9th Cir. 2006) .......... 25

*United States v. James Daniel Good Real Prop.*,
510 U.S. 43 (1993) .......... 34

*Wacko's Too, Inc. v. City of Jacksonville*,
134 F.4th 1178 (11th Cir. 2025) .......... 24

**Statutes**

Fla. Stat. § 60.05 .......... 4

Fla. Stat. § 617.1420 .......... 1

Fla. Stat. § 775.30 .......... 1, 14, 27, 30

Fla. Stat. § 775.31 .......... 14

Fla. Stat. § 775.33 .......... 1, 6, 9, 12, 14, 19, 23

Fla. Stat. § 775.34 .......... 1, 13, 15

Fla. Stat. § 777.011 .......... 14

Fla. Stat. § 777.04 .......... 12, 14, 19

Fla. Stat. § 823.05 .......................................................................... 1, 4, 7, 15, 26

Fla. Stat. § 874.03 ........................................................ 1, 7, 12, 18, 19, 20, 26, 30

Fla. Stat. § 874.03 (2025)...............................................................................19

Fla. Stat. § 874.04 ............................................................................................1

Fla. Stat. § 874.05 ..........................................................................................15

Fla. Stat. § 874.08 ...................................................................................... 7, 13

Fla. Stat. § 874.10 ........................................................................... 7, 12, 15, 23

Fla. Stat. § 943.03102 .................................................... 1, 4, 5, 6, 13, 26, 27, 30, 32

PL 104-132 § 301(a)(1)-(3), April 24, 1996, 110 Stat. 1214 .................................35

**Rules**

Florida Department of Law Enforcement Emergency Rule 11RER26-8 ...................................................................................... 1, 8, 9

**Other Authorities**

Eric Daugherty (@EricLDaugh), X, (Nov. 7, 2026, at 04:20 ET) .........................16

Gov't Reply, *Holder v. Humanitarian Law Project*, 2010 WL 565212 (U.S. Feb. 16, 2010)......................................................................... 17, 36

H.R. Rep. 107-236, pt. 1 (2001) .......................................................................35

Ron DeSantis (@RonDeSantis), X.com (Nov. 5, 2026, at 1:20 PM ET) ...........................................................................................16

## INTRODUCTION

Plaintiffs–Appellants—U.S. civil rights organizations that advocate for religious liberty and the equal treatment of Muslims—move for an injunction pending appeal under FRAP 8 to restore their constitutional rights. A new Florida law, HB 1471, has forced Plaintiffs to end operations in Florida because executive officials have unilaterally branded them as "domestic terrorist organizations" or "DTOs." As a result, Plaintiffs' otherwise-legal speech and association are now felonies. Defendants have silenced Plaintiffs' community outreach, pro bono legal representation, educational initiatives, press releases, and policy advocacy. Because each passing day results in further irreparable injury to Plaintiffs' First Amendment rights, Plaintiffs respectfully request that the Court grant relief by **November 19, 2026**.

Under Florida's unprecedented DTO regime,[1] a handful of Florida officials are authorized to designate any U.S. group as a DTO. The consequences of designation are catastrophic. A designated group has no choice but to shutter its Florida operations and silence its voice in the state. Otherwise, the group, its staff, and its supporters are subject to felony liability and risk life imprisonment for

[1] The "DTO regime" consists of §§ 617.1420, 775.30, 775.33, 775.34, 874.03 (and the related "criminal gang" provisions in Sections 823.05 and 874.04-12), and 943.03102, and Florida Department of Law Enforcement Emergency Rule 11RER26-8, insofar as they concern "domestic terrorist organizations" or "DTOs."

virtually any activity—including First Amendment-protected activity—that advances the group's work.

Plaintiff CAIR is the largest Muslim civil-rights organization in the country. Plaintiff CAIR-Florida is an affiliated chapter incorporated in Florida. They have a shared mission: to enhance public understanding of Islam, protect civil rights, and advocate for American Muslims. They have pursued this mission for decades.

Plaintiffs have never been charged with, let alone convicted of, a crime. But they *have* been vocal critics of top Florida officials, drawing the ire of state executives and lawmakers. In October 2026, Florida's Governor and Cabinet voted to designate Plaintiffs as "domestic terrorist organizations," and the designation became effective November 5.

The evidence that Plaintiffs violated Florida law is non-existent. Yet Plaintiffs have had no meaningful opportunity to challenge their designation because the DTO regime provides for virtually no pre-designation process. The regime's post-designation state court "appeal" option is likewise inadequate. The state court proceeding is limited to a highly deferential review of the factual "record" that officials used below. And the harm to Plaintiffs' First Amendment rights began before the statute even permits state court review.

Plaintiffs thus sought preliminary relief in federal district court, explaining that the DTO regime violates both the First Amendment and due process.

The district court almost entirely denied Plaintiffs' request for relief. In doing so, it committed two broad errors. First, it failed to apply key Supreme Court associational rights and due process precedents. Second, it wrongly and heavily relied on lower-court cases involving federally designated foreign and global terrorists. These programs target *international* terrorism, and they are based on uniquely *federal* powers, such as foreign policy. Courts have, accordingly, given the federal government more latitude to regulate in this arena—with fewer protections for those affected. *See, e.g.*, *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1137 (9th Cir. 2000) ("*Reno*") ("because the regulation involves the conduct of foreign affairs, we owe the executive branch even more latitude than in the domestic context"). In addition, these lower-court cases almost entirely pre-date *Holder v. Humanitarian Law Project*, where the Supreme Court was clear: its ruling on the federal regime did "not suggest that Congress could extend the same prohibition on material support at issue here to domestic organizations." 561 U.S. 1, 39 (2010) ("*HLP*"). Florida's DTO regime exclusively targets U.S. groups and is rooted in the state's ordinary police powers. It does what the Supreme Court cautioned against.

Plaintiffs' voices in Florida have gone silent. With every passing day, Plaintiffs' designations do irreparable harm. This Court should grant an injunction pending appeal to restore the status quo.

## REQUESTED RELIEF

Plaintiffs request an injunction pending appeal directing Defendants Larry Keefe, Ron DeSantis, James Uthmeier, Blaise Ingoglia, and Wilton Simpson (together, the "State Executive Defendants") to remove the designation of Plaintiffs as "domestic terrorist organizations" or "DTOs"; directing Defendant Keefe to rescind the publication of such designation in the Florida Administrative Register; and directing Defendant Keefe not to publish such designation on the Florida Department of Law Enforcement website.

Plaintiffs' requested relief—removing and rescinding their designation pending appeal—is necessary to restore the status quo ante. If the Court were to enjoin only Defendants' enforcement of the DTO regime, it would not protect Plaintiffs from being enjoined by *private citizens* as a nuisance under Florida Statutes §§ 874.03(1), (4), (8), 823.05(2) and 60.05, because their designation as DTOs has been published in the Florida Administrative Register. Fla. Stat. § 943.03102. Thus, any activity by Plaintiffs—including First Amendment-protected speech and association—that is intended to further their interests is per se a public nuisance, and any citizen of the county where the "nuisance" exists may sue to enjoin it. These nuisance abatement suits will cause irreparable harm traceable to the State Executive Defendants' designation. App.89-90 (¶ 81).

Because the State Executive Defendants are statutorily authorized to "publish" and "remove" Plaintiffs' designations, Fla. Stat. § 943.03102(1)(b), 2(e), (3)(a)-(b), the relief Plaintiffs seek runs directly to the officials with relevant enforcement authority, "fit[ting] neatly within" the Court's equitable power. *Doe 1-13 By & Through Doe, Sr. 1-13 v. Chiles*, 136 F.3d 709, 720 (11th Cir. 1998).[2]

Alternatively, Plaintiffs request that the Court enjoin pending appeal Florida's twenty state attorneys (together, "State Attorney Defendants") and the Attorney General from enforcing the DTO regime's provisions against Plaintiffs pursuant to their designations, and from enforcing the DTO regime's provisions against third parties in connection with Plaintiffs' designations.

Defendants oppose this motion.

## STATEMENT OF FACTS

### I. Plaintiffs' Designation

Plaintiffs CAIR-Foundation, Inc. ("CAIR") and CAIR Florida, Inc. ("CAIR-Florida") are two nonprofit organizations that have engaged in civil rights work in

---

[2] Plaintiffs seek relief that returns the parties to the status quo ante, prior to Plaintiffs' designation, and therefore the ordinary injunction standard applies. *See Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) (distinguishing relief that "return[s] to the last uncontested status quo between the parties" from "a mandatory injunction"); *Nutra Health, Inc. v. HD Holdings Atlanta, Inc.*, 2021 WL 5029427, at *2 (N.D. Ga. June 29, 2021); *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (defining the status quo for prohibitory injunction as "the last uncontested status between the parties which preceded the controversy").

the state for decades. App.41-42 (¶¶ 2-3); App.68 (¶ 3). They have never been charged with, much less convicted of, a crime. App.42 (¶ 5); App.68 (¶ 4). They have, however, criticized Florida officials' policies and their religious animus. App.43-45, 47-49 (¶¶ 9-14, 22-26); App.69-70, 72-74 (¶¶ 8-12, 20-26).

State officials have relentlessly targeted Plaintiffs and have now forced them to shutter their Florida operations by designating them as "domestic terrorist organizations" under Florida's new DTO regime. App.50 (¶¶ 33-34); App.76-78 (¶¶ 36-39); App.114-16. The regime allows the Chief of Domestic Security to designate organizations that he "finds" to be engaging in "terrorist activity," subject to approval by the Governor and Florida Cabinet. Fla. Stat. § 943.03102(1)(a)(1).

The consequences of designation are severe. Once an organization is designated, the DTO regime forbids anyone from providing the designated organization with "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance … facilities … personnel, or transportation." *Id.* § 775.33(1)(d). This felony, punishable by up to 30 years' imprisonment, bars the designated organization from having employees, receiving donations, and engaging in any advocacy.

The DTO regime also classifies designated organizations as "criminal gangs" under Florida's Criminal Gang Prevention Act ("CGPA"), triggering even more criminal prohibitions. Fla. Stat. § 874.03(1), (8). For instance, under the CGPA, it is a felony, punishable by up to life in prison, if "[a]ny person … knowingly initiates, organizes, plans, finances, directs, manages, or supervises" activity intended to "benefit, promote, or further the interests" of a designated organization. *Id.* §§ 874.10, 874.03(4)(a). This prohibition forbids essentially any action taken to further the designated organization's interests, including actions taken by the organization itself.

These are only two of the many penalties imposed on designated organizations. *See supra* n.1; *see, e.g.*, Fla. Stat. §§ 874.08 (authorizing state to seize all "proceeds" and "instrumentalities" of activity intended to further the interests of criminal gang), 823.05(2) (deeming all criminal gangs to be per se "public nuisances" and authorizing immediate abatement and enjoinment, including in suits brought by members of the public). The DTO regime is clear: those who do not immediately disassociate from a designated organization will be prosecuted and face up to life in prison.

Any regime imposing such severe consequences—effectively banishing a nonprofit from the state—surely requires a robust pre-designation process. But the process here is nearly non-existent. The DTO regime imposes no burden of proof

nor sets any evidentiary standards or limitations. Organizations are not entitled to a hearing, may not seek discovery, and may not cross-examine witnesses. Political actors, not neutral judges, approve designation: the Governor and three Florida Cabinet members. Once the Chief of Domestic Security issues a notice of intent to designate an organization, its only pre-designation recourse is to submit a written objection to the decisionmakers. 11RER26-8(2)(a).

On July 1, 2026, Governor DeSantis announced that he had received a notice of intent to designate CAIR. App.115. The Florida Department of Law Enforcement then decided to promulgate regulations, and on September 15, the Chief of Domestic Security issued a second notice of intent to designate Plaintiffs. App.104-11.

Plaintiffs were denied a meaningful opportunity to object to the designations. The September 15 Notice of Intent identifies no law Plaintiffs violated and no criminal or terrorist activity in which Plaintiffs are allegedly engaging (and it does not discuss CAIR-Florida at all). App.104-11. This is no surprise: Plaintiffs do not engage in terrorist activity. App.187 (¶ 2); App.190 (¶ 2). A former State Department official who led the Department's federal terrorism designation efforts from 2008 to 2018 has explained there was no credible evidence linking CAIR to terrorist financing or support. App.181-83 (¶¶ 25-31);

*see also* App.195-96 (letter from U.S. Secretary of State to CAIR stating that "the U.S. government clearly does not consider CAIR to be a terrorist organization").

Despite the flawed and inadequate Notice of Intent, Plaintiffs submitted written objections. App.113-19. On September 29, Governor DeSantis and the Cabinet voted to approve the proposed second designation at a public meeting. App.98-99 (¶¶ 4-6). Plaintiffs were not allowed to speak or contest their designation at that meeting, and the consideration of Plaintiffs' designation lasted 30 seconds. App.97-99 (¶¶ 3-6). The Chief of Domestic Security published the designation on October 6, 52 F.A.R. 194, 4406, and it became effective on November 5, 11RER26-8(3).

## II. Plaintiffs' Suit and Appeal

Plaintiffs filed this suit on October 1, 2026. On October 2, Plaintiffs moved for a preliminary injunction on due process and First Amendment grounds. The district court denied Plaintiffs' motion in part on November 4. App.1-37. It preliminarily enjoined enforcement of Florida Statutes § 775.33(3) solely with respect to the provision of legal services to Plaintiffs. App.36-37. On November 5, Plaintiffs filed a notice of appeal from that decision. On November 7, Plaintiffs filed a motion for injunction pending appeal in the district court, which the court denied on November 10. App.38-39.

This appeal is related to another case brought by Plaintiffs against Governor DeSantis challenging an Executive Order designating them as terrorist organizations. *See CAIR-Found., Inc. v. DeSantis*, No. 25-cv-516 (N.D. Fla.). The district court in that case preliminarily enjoined enforcement of that Executive Order on First Amendment grounds. Governor DeSantis's appeal of that decision is pending. *See CAIR Found. v. DeSantis*, No. 26-10735 (11th Cir.).

## ARGUMENT

To obtain an injunction pending appeal, Plaintiffs must show: (1) a substantial likelihood they will prevail on the merits of the appeal; (2) a substantial risk of irreparable injury; (3) no substantial harm to interested persons; and (4) no harm to the public interest. *Florida v. Dep't of Health & Human Servs.*, 19 F.4th 1271, 1279 (11th Cir. 2021). Although Plaintiffs have established a substantial likelihood of success on the merits, this Court "relax[es]" that requirement where, as here, the balance of the equities weighs heavily in favor of an injunction. *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1370 (11th Cir. 2022); *see Gonzalez ex rel. Gonzalez v. Reno*, 2000 WL 381901, at *1 (11th Cir. Apr. 19, 2000) (requiring only a "substantial case on the merits" in light of equities).

## I. The DTO Regime and Plaintiffs' Designations Violate the First Amendment.

### A. The DTO regime and Plaintiffs' designations violate their freedom of association.

Plaintiffs' designations under the DTO regime, and the resulting array of penalties for their First Amendment-protected activity, violate Plaintiffs' freedom of association. The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). Freedom of association "is especially important in … shielding dissident expression from suppression by the majority." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) ("*AFP*").

In Florida, Plaintiffs have long engaged in the type of expressive association at the heart of the First Amendment: through pro bono legal representation, education, community organizing, and advocacy, they have sought to promote religious tolerance, civil rights, and the equal treatment of Muslims in the United States. App.43-49 (¶¶ 8-28); App.69-76 (¶¶ 7-35). But DTO designation has brought Plaintiffs' protected associations in Florida to a halt. *See* App.42-43, 57-65 (¶¶ 6-7, 52-75); App.68-69, 86-91 (¶¶ 5-6, 69-81, 86-87); App.94-95 (¶¶ 2-4).

These associational activities will subject Plaintiffs (and the people and organizations they associate with) to severe criminal liability under the DTO

regime. For example, anyone who "initiates, organizes, plans, finances, directs, manages, or supervises" any "activity"—*including protected associational activity*—"committed with the intent to benefit, promote, or further the interests of" Plaintiffs commits a felony. Fla. Stat. §§ 874.10, 874.03(4)(a). If Plaintiffs take any action to obtain "material support" under Section 775.33—to have employees, facilities, or communications services, for example—they would face liability for criminal solicitation and conspiracy. Fla. Stat. § 777.04.

The DTO regime also impermissibly coerces Plaintiffs' employees, board members, donors, vendors, and others into disassociating from Plaintiffs. *See NRA v. Vullo*, 602 U.S. 175, 190 (2024) ("A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf."). For example, Section 775.33 imposes felony liability for providing material support to Plaintiffs, including engaging in expressive association with Plaintiffs as an employee, board member, volunteer, or donor. That far-reaching threat of liability is predictably coercive and runs directly afoul of *Noto v. United States*, 367 U.S. 290, 300 (1961) (criminal liability based on association with a domestic expressive organization requires specific intent to further illegal acts). CAIR and CAIR-Florida even face liability for providing material support to one another in their expressive activities.

Numerous other provisions of the DTO regime regulate and coerce individuals into disassociating from Plaintiffs—directly interfering with Plaintiffs'

protected associations and speech. *See, e.g.*, Fla. Stat. §§ 943.03102(4)(b)-(c) (prohibiting state and municipal entities from spending funds "to support" any "member" of DTOs), 775.34 (prohibition on membership), 874.08 (property used to facilitate DTO activity is subject to seizure and forfeiture). And because designation forces Plaintiffs to shut down operations in Florida altogether, even the simplest forms of Plaintiffs' expressive association—such as their ability to host educational events or communicate through their community-outreach email lists—are prohibited.

Because the DTO regime extinguishes Plaintiffs' associational rights, at a minimum, "exacting scrutiny" applies: the burden must be "narrowly tailored to the government's asserted interest," which must be "substantial." *AFP*, 594 U.S. at 607-08; *id.* at 609 (narrow tailoring critical because "First Amendment freedoms need breathing space to survive").

The DTO regime and the designations of Plaintiffs fail this test. Criminalizing Plaintiffs' expressive association bears no relationship whatsoever to the state's interest in preventing violent terrorism. Halting Plaintiffs' legal representations, educational programs, community organizing, and policy advocacy will not punish or prevent terrorist acts. Indeed, nothing about the DTO regime or Plaintiffs' designations is narrowly tailored. The law is designed to allow Florida's executive branch to silence any organization it wishes, including if

officials simply disagree with the organization's constitutionally protected political messages. Predictably, designation has halted Plaintiffs' ability to engage in protected association in Florida. App.57-65 (¶¶ 52-56, 58-67, 73-75); App.80, 86-91 (¶¶ 51, 69-81, 86-87); App.95 (¶¶ 3-4).

Moreover, Florida law *already* criminalizes terrorism, facilitating or furthering terrorism, and providing material support to a foreign terrorist group—along with aiding, abetting, and conspiring to commit those crimes. Fla. Stat. §§ 775.30, 775.31, 775.33(3), 777.011, 777.04. Because the state can rely on these traditional tools to investigate and prosecute terrorism—without burdening Plaintiffs' associational rights—the DTO regime and designations of Plaintiffs are "hardly … narrowly tailored solution[s]." *McCullen v. Coakley*, 573 U.S. 464, 493-94 (2014) (existence of criminal laws that already address a purported state interest is significant factor in tailoring analysis).

In rejecting Plaintiffs' association claim, the district court erred in several respects. First, it examined the material support statute in isolation, Fla. Stat. § 775.33, and held that it does not violate Plaintiffs' rights because it "targets material support of DTOs—not their associations." App.26. But under the Supreme Court's expressive-association precedents, what matters is whether state action *substantially burdens* association, even if the state is "targeting" something else. *See, e.g.*, *Bates v. City of Little Rock*, 361 U.S. 516, 524 (1960) (applying

heightened scrutiny to a municipal tax ordinance that burdened associational rights); *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659 (2000) (applying heightened scrutiny to public accommodations law that burdened associational rights); *NAACP v. Button*, 371 U.S. 415, 438-39 (1963) (applying heightened scrutiny to legal solicitation statute that burdened associational rights). The district court did not engage with any of these cases.

In addition, contrary to the district court's suggestion, App.26, the DTO regime *does* target associations. That is evident not only from the discretion it vests in executive officials to criminalize association and the breadth of the prohibitions, *see, e.g.*, Fla. Stat. § 874.10, but also from the provisions expressly targeting association, *see, e.g.*, Fla. Stat. §§ 775.34 (prohibition on membership), 874.05 (prohibition on recruitment of DTO members), 823.05(2)(b)-(c) (DTO, DTO members, or DTO associates who engage in DTO-related activity are a per se public nuisance). And here, Defendants targeted Plaintiffs for designation because of their religious views, speech, and advocacy. *See* App.44-50 (¶¶ 11-28, 33-34); App.70-74, 76-78 (¶¶ 11-27, 36-39); App.104-11 (citing alleged speech and association); App.114-18 (explaining that notice relies on "chains of attenuated

association"). Recent public statements by Governor DeSantis further confirm that the targeting of Plaintiffs was based on hostility to Plaintiffs' faith and views.[3]

Second, the D.C. Circuit cases cited by the district court are inapposite. App.26-27. Both pre-date, and thus do not grapple with, *HLP*, 561 U.S. at 39. There, the Supreme Court recognized that designating and prohibiting material support to "domestic organizations" would raise different, more severe First Amendment problems than the federal government's designation of foreign organizations. *Id.* ("We also do not suggest that Congress could extend the same prohibition on material support at issue here to domestic organizations.").[4] The reasons for this are many, including the volume of domestic speech and association that is burdened by a law like Florida's, as opposed to the narrow, isolated forms of support at issue in *HLP*, 561 U.S. at 14-15. In addition, the federal government, relying on its distinct foreign-affairs powers, has more latitude to regulate

---

[3] *See, e.g.*, Ron DeSantis (@RonDeSantis), X.com (Nov. 5, 2026, at 1:20 PM ET), https://perma.cc/WL6V-QKQ5; Eric Daugherty (@EricLDaugh), X, (Nov. 7, 2026, at 04:20 ET) https://perma.cc/6HBZ-KQKQ (Governor DeSantis discussing CAIR's designation alongside criticisms of Muslim immigrants and Islam).

[4] Below, Defendants attempted to confine that observation to the Court's "free-speech analysis." Opp. 32 n.11, No. 4:26-cv-521, ECF 55. But the Court relied on "the same reasons" in resolving the plaintiffs' speech *and* association claims. *HLP*, 561 U.S. at 40. Those reasons include specific factual findings by Congress and the Executive Branch that, for FTOs with lawful and unlawful aims, any support to the FTOs was "fungible." *Id.* at 30-34. But there are no such factual findings here (nor would they be worthy of the same deference). And Plaintiffs do not have illegal aims. App.187 (¶ 2); App.190 (¶ 2).

Americans' associations with foreigners abroad than Americans' associations with one another. Gov't Reply, *HLP*, 2010 WL 565212, at *40–41 (U.S. Feb. 16, 2010) (citing *Dames & Moore v. Regan*, 453 U.S. 654 (1981)). In that unique context, the federal government's factual determinations concerning foreign terrorists and associations have also been accorded extreme deference. *See, e.g.*, *Reno*, 205 F.3d at 1137 ("[B]ecause the regulation involves the conduct of foreign affairs, we owe the executive branch even more latitude than in the domestic context.").

The D.C. Circuit cases simply do not speak to the facts here. *People's Mojahedin Organization of Iran v. Department of State*, 327 F.3d 1238, 1244 (D.C. Cir. 2003), involved a *foreign* terrorist organization that sought donations from Americans. But Plaintiffs do not seek to send money abroad; they seek to engage in protected association with Americans. *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 736-37 (D.C. Cir. 2007), involved a U.S. group whose articles of incorporation described it as an affiliate of a terrorist organization abroad. *Id.* at 733. The court emphasized that the asset-blocking at issue merely prohibited donations to foreign terrorists and did not "prohibit [] associational activity other than financial support." *Id.* at 736. Florida's regime, in contrast,

directly regulates association and forces Plaintiffs—longstanding U.S. civil society nonprofits—to terminate all their expressive associations in the state.[5]

Third, the district court erred by minimizing the "criminal gang" elements of the DTO regime, which explicitly target association and have no parallel in the federal cases the court relied on. The court reasoned that Section 874.03 does not automatically make Plaintiffs "criminal gangs," App.26, but that interpretation is at odds with the statute's text and structure. Section 874.03(1) states:

> "Criminal gang" means a formal or informal ongoing organization, association, or group that has as one of its primary activities the commission of criminal or delinquent acts, and that consists of three or more persons who have a common name or common identifying signs, colors, or symbols, including, but not limited to, terrorist organizations, transnational crime organizations, and hate groups.

Fla. Stat. § 874.03(1).

Under Section 874.03, terrorist organizations are per se criminal gangs. Because the concluding phrase "including, but not limited to, terrorist organizations" is separated by a comma from the preceding definition, it applies to the preceding definition as a whole. *See Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1257 (11th Cir. 2014) (the "'rule of punctuation' states that the comma

---

[5] These cases also predate *AFP*, which reiterated that the First Amendment protects Americans' ability to associate for expressive purposes through donations. *AFP*, 594 U.S. at 618.

indicates the drafter's intent that the modifier relate to more than the last antecedent").

On the district court's reading, a "terrorist organization" is merely an illustrative example of an "organization," and the last clause of the definition does no work. *See In Re Shek*, 947 F.3d 770, 777 (11th Cir. 2020) (discussing surplusage canon). But if the district court were correct, there would have been no reason for the legislature to *amend* Section 874.03's definition of "terrorist organizations" to expressly include DTOs. *Compare* Fla. Stat. § 874.03(8) (2026), *with* Fla. Stat. § 874.03(8) (2025). This amendment was designed to have legally operative effect—it was designed to define DTOs as criminal gangs.

In any event, if Plaintiffs were to continue operating in Florida, their conduct would indisputably satisfy the "criminal gang" definition. *Cf.* App.260 (63:10-13) (in Defendants' view, Plaintiffs are criminal gangs). If Plaintiffs (entities with three or more employees) were to operate in Florida, one of their "primary activities" would be the "commission of criminal or delinquent acts" under Section 874.03(1). That is because Plaintiffs would necessarily rely on prohibited "material support" to operate, including through personnel, facilities, and donations, *see* Fla. Stat. § 775.33; and Plaintiffs' actions to obtain this "material support" would constitute criminal solicitation and conspiracy, *see id.* § 777.04. Plaintiffs would inescapably

be "criminal gangs" under Florida law. Thus, the court's analysis should have accounted for the impact of Section 874.03(1) on Plaintiffs' associational rights.

Fourth, the district court's reliance on *Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986), App.27, was misplaced. *Arcara* is not an associational-rights case. Regardless, as *Arcara* explains, First Amendment scrutiny applies: (1) to statutes that, "although directed at activity with no expressive component, impose a disproportionate burden upon those engaged in protected First Amendment activities"; (2) to "statute[s] regulating conduct which ha[ve] the incidental effect of burdening the expression of a particular political opinion"; and (3) where "conduct with a significant expressive element" "drew the legal remedy in the first place." 478 U.S. at 702-04, 706.

Here, a handful of state officials have forced Plaintiffs to close their doors in Florida, ending an enormous amount of protected speech and association in the state. Even if the Court were to conclude that the DTO regime and Plaintiffs' designations are not directed at expression, they nevertheless impose a "disproportionate burden" on Plaintiffs' speech and association. *Id.* at 704; *see also TikTok Inc. v. Garland*, 604 U.S. 56, 67-69 (2025) (applying First Amendment scrutiny to "regulation of non-expressive activity that disproportionately burdens those engaged in expressive activity"). Designation also burdens the expression of Plaintiffs' particular viewpoints and advocacy. App.44-55, 57-58 (¶¶ 11-29, 38-42,

48-56); App.70-88 (¶¶ 11-27, 30, 42-43, 51-52, 54-76). And it was "conduct with a significant expressive element that drew the legal remedy in the first place," *Arcara*, 478 U.S. at 706. *See supra*, pp. 15-16.

*Arcara* involved no complaint about inadequate process under the First Amendment or excessive executive discretion to censor organizations; instead, a bookstore argued that it should be exempt from the enforcement of an ordinary public nuisance statute simply because it was a bookstore. Here, Plaintiffs are not challenging an ordinary civil statute or the application of traditional legal process; they are challenging an unprecedented state designation regime, where executive officers unilaterally wield the power to brand organizations as terrorists and deprive them of First Amendment rights. *See infra*, pp. 34-35.

**B. The DTO regime and Plaintiffs' designations impose a prior restraint on their speech and association.**

Designation under the DTO regime functions as a prior restraint because it allows Florida's executive branch to suppress disfavored speech and association before they take place. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 71 (1963). "A prior restraint on expression exists when the government can deny access to a forum for expression before the expression occurs." *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1223 (11th Cir. 2017); *see also Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306, 1321 (11th Cir. 2024) ("[A]lthough the term 'prior restraint'

calls to mind government officials censoring newspapers and magazines … in fact it applies more broadly.”).

Here, executive officials decide whether a domestic organization’s constitutionally protected speech and association can continue as usual, or whether the same speech and association will, going forward, be a crime. Because the DTO regime vests power in the executive branch to *change the legal status* of protected speech and association on a prospective basis, designation is a prior restraint.

Contrary to the district court’s characterization, Plaintiffs’ prior restraint argument is *not* that “designation will effectively shut them down.” App.28. Rather, Plaintiffs’ prior restraint argument is that their expressive and associational activities have become criminal acts by executive fiat. Ordinary criminal and civil penalties can also result in speech being shut down, as in *Alexander v. United States*, 509 U.S. 544, 549-50 (1993); the fact of being shut down, standing alone, does not impose a prior restraint. But here, in contrast to *Alexander*, designation is not a penalty for a past, properly adjudicated violation of criminal law, where the defendant had the benefit of sufficient legal process. Instead, the key feature of the DTO regime is excessive executive discretion to transform—prospectively—the legal status of protected speech into a strict liability crime. On November 4, it was lawful for Plaintiffs to speak through their employees, criticize public officials, and advocate for the equal treatment of Muslims. But solely by virtue of Defendants’

discretionary designations, that protected speech and advocacy is now a felony. *See, e.g.*, Fla. Stat. §§ 775.33, 874.10.

The court further erred in reasoning that designation is not a prior restraint because it does not "explicitly forbid any communications." App.28. The term "prior restraint" "in fact applies more broadly." *Jarrard*, 115 F.4th at 1321; *see also, e.g.*, *Bourgeois v. Peters*, 387 F.3d 1303, 1317 (11th Cir. 2004) (police searches of protesters prior to entry into a protest site were a prior restraint). In *Healy v. James*, 408 U.S. 169, 183-84 (1972), for example, a college's non-recognition of a student group was a type of "prior restraint" on associational rights, even though the student group was free to continue to associate.

*Bantam Books* is directly on point. There, the Supreme Court held that a Rhode Island law establishing a "Commission to Encourage Morality in Youth" was an unconstitutional prior restraint. 372 U.S. at 59, 70-71. After the commission unilaterally deemed a book obscene, it would send a notice so informing the book distributor—pressuring the distributor to halt circulation of the targeted books. *Id.* at 68. The Court held that the scheme was a prior restraint because: (1) the commission pressured distributors to stop distributing speech; (2) it was "not a judicial body"; and (3) its decisions did not "follow judicial determinations that such publications may lawfully be banned." *Id.* at 70. The "vice" of the system was

that the commission served as an end-run around the criminal process. *Id.* at 69-70. So too, here.

The district court reasoned that *Bantam Books* was inapposite because Plaintiffs' designations "target Plaintiffs' conduct, not their speech." App.29-30. That is wrong in at least two respects. First, *Bantam Books* involved a regulation of *unprotected* speech—obscenity. Nevertheless, the Court held that the lack of procedural safeguards risked harm to protected expression. 372 U.S. at 65-66. Second, the DTO regime is aimed at speech and association: it targets protected association on its face, and Plaintiffs' speech and alleged speech prompted the designation. *See supra*, pp. 15-16; *see also Chiles v. Salazar*, 607 U.S. 627, 642-46 (2026) (First Amendment rights cannot be "nullified by 'mere labels'" (citing *NAACP*, 371 U.S. at 429)); *Healy*, 408 U.S at 184 (restriction on association was prior restraint).

Because the DTO regime and Plaintiffs' designations present the "grave dangers of a censorship system," *Wacko's Too, Inc. v. City of Jacksonville*, 134 F.4th 1178, 1192 (11th Cir. 2025) (citation modified), the Supreme Court requires three procedural protections under *Freedman v. Maryland*: (1) the state must bear the burden of going to court and proving that the speech it seeks to prohibit is unprotected; (2) the statute must require a final judicial determination on the merits "within a specified period"; and (3) the status quo should be maintained prior to

judicial review, or any restraint should be limited to "the shortest fixed period compatible with sound judicial resolution." 380 U.S. 51, 58-60 (1965). The DTO regime lacks these features.

As Judge Kozinski and four other Ninth Circuit judges have explained, "[a] terrorist designation is … a type of prior restraint on speech, because it criminalizes monetary contributions that would otherwise be protected by the First Amendment." *United States v. Afshari*, 446 F.3d 915, 915-22 (9th Cir. 2006) (Kozinski, J., dissenting from denial of rehearing en banc). The "crux" of the First Amendment issue with terrorist designations is "the *process* by which the designation was made," and, in evaluating that process, "we must rely on the guidance of *Freedman*." *Id.* at 918.

### C. The DTO regime is unlawful because it vests excessive discretion in Florida's executive branch to suppress disfavored speech and association.

Whether labeled a "prior restraint" or not, the DTO regime violates the First Amendment because it grants executive officials unduly broad discretion to choose which speech and association to suppress. In *Bell v. City of Winter Park*, 745 F.3d 1318, 1324-25 (11th Cir. 2014), for example, the Court applied the "unbridled discretion" doctrine to an ordinance allowing any citizen to prohibit speech within 50 feet of his or her property. Although the Court did not characterize the

ordinance as a prior restraint, it nevertheless held that the ordinance vested excessive discretion in the public to silence speech. *Id.*[6]

The State Executive Defendants' discretion to designate U.S. groups is entirely unlike ordinary prosecutorial discretion, where a prosecutor decides whether to bring charges concerning a completed violation of a generally applicable criminal law. Instead, under the DTO regime, executive officials' discretionary choice *transforms* otherwise lawful speech and association into criminal speech and association. That choice triggers unique, prospective, and debilitating liabilities for DTOs and those who associate with them.

Where, as here, a statute allows an executive official to burden First Amendment-protected expression, it must provide the official with narrow, precise, and objective standards. While "some measure of discretion is acceptable," "virtually any amount of discretion beyond the merely ministerial is suspect." *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1362 (11th Cir. 1999).

The DTO regime fails this test. Under Section 943.03102(1)(a), the Chief of Domestic Security may designate an organization as a DTO if, among other things, "[t]he terrorist activity of the organization is an ongoing threat to the security of this state or the United States," and "[t]he organization is engaging in terrorist

[6] The Winter Park ordinance bears a striking resemblance to the DTO regime's public nuisance provision. *See* Fla. Stat. §§ 874.03(1), (8)(a); 823.05(2)(b)-(c).

activity as defined in [§] 775.30." The "ongoing threat" and "security" assessments are inherently discretionary, and the statute fails for this reason alone: it allows executive officials to pick and choose which organizations may continue with their protected expression, based on criteria that are neither precise nor objective. How serious must the threat be? How probable? How imminent?

Likewise, the "terrorist activity" prong confers significant discretion on executive officials. Under Section 775.30, "terrorist activity" involves "a violation of the criminal laws of this state or of the United States." This allows officials to "decide which statutes or ordinances apply" and "whether the applicant has violated those laws." *Fly Fish, Inc. v. City of Cocoa Beach*, 337 F.3d 1301, 1313 (11th Cir. 2003) (holding ordinance unconstitutional).

Although the DTO regime contemplates that a designated group may file an "appeal" in state court, Fla. Stat. § 943.03102(2)(f), that is no substitute for precise, objective standards to govern executive discretion in the first instance, *see, e.g.*, *Bourgeois*, 387 F.3d at 1316-20 (analyzing excessive discretion and inadequate judicial review as independent constitutional violations).

The district court rejected this argument on the ground that "the DTO designations are not directed at Plaintiffs' speech." App.30. But as Plaintiffs have explained, the regime itself is directed at speech and association, and the state's

purported justifications for the designation rest on alleged speech and association. *See supra*, pp. 15-16.

**D. The DTO regime and Plaintiffs' designations fail First Amendment scrutiny.**

As discussed above, Plaintiffs' associational claim triggers at least exacting scrutiny, and their prior restraint and unbridled discretion arguments are fatal to their designations under the DTO regime. Alternatively, the Court should, at minimum, apply intermediate scrutiny to the entire DTO regime because it directly and significantly burdens Plaintiffs' free expression. Even under intermediate scrutiny, Defendants fail to show that the DTO regime and Plaintiffs' designations do not "burden substantially more speech than necessary" to further the state's interests. *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997).

As Plaintiffs have shown, designation suppresses an immense amount of protected speech by forcing Plaintiffs to forgo policy advocacy, litigation, education, community organizing, and public commentary. It also suppresses the speech of all those who wish to engage in expressive activity with Plaintiffs in Florida, including donors, volunteers, and other supporters. *See supra*, pp. 11-14.

On the other side of the ledger, Defendants' "evidence" for why shutting down all this speech is "necessary" is entirely inadequate. Defendants say they seek to halt ongoing criminal activity, but they offer no explanation why they

could not criminally prosecute Plaintiffs for any alleged crimes officials believe Plaintiffs committed.

And, while the Supreme Court has upheld restrictions on material support to *federally* designated *foreign* terrorist organizations, it expressly declined to extend its holding to domestic organizations. *HLP*, 561 U.S. at 39. In addition to the reasons above, there are stark differences between thwarting foreign terrorist organizations—where the federal government's tools are often blunt and limited—and policing domestic organizations, where the state can rely on ordinary legal processes like subpoenas, search warrants, grand juries, and criminal prosecutions. Investigating suspected criminal activity is exactly what those processes, and their longstanding protections, are designed for. *See McCullen*, 573 U.S. at 492. Significantly, *HLP* also relied on the premise that "providing foreign terrorist groups with material support in any form … strain[s] the United States' relationships with its allies." 561 U.S. at 32-33. That factor is inapplicable here.

Below, Defendants argued that "[e]ven seemingly benign services 'lend legitimacy' to the organization" and "promote[] the terrorist organization as a whole." Opp. 43-44, ECF 55 (quoting *HLP*, 561 U.S. at 30-31). While the Supreme Court accepted Congress's and the Executive Branch's factual finding on that question given the federal government's foreign affairs expertise, *HLP*, 561

U.S. at 29-30, Defendants have no comparable authority or expertise. For all these reasons, the DTO regime fails even intermediate scrutiny.

## II. Plaintiffs Were Deprived of Due Process.

Plaintiffs' designations under the DTO regime have deprived them of due process in two ways. First, Plaintiffs' designations are criminal punishments imposed unilaterally by executive officers. Second, and alternatively, Plaintiffs' Defendants' procedures fail the balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

### A. Designation is criminal punishment by another name and so requires criminal process.

To designate an organization under the DTO regime, the state's chief law enforcement officer must find that it is engaging in "terrorist activity," which by definition requires a violation of criminal law. Fla. Stat §§ 775.30(1), 943.03102(1)(a)1. Designation also transforms an organization into a "criminal gang." *Id.* § 874.03(1), (8). The regime is plainly intended to punish criminal conduct while bypassing the criminal process and the burden of proof the state must meet to prove criminal charges. The Constitution does not allow for such a "short-cut procedure," especially where the state's action threatens First Amendment-protected speech. *Speiser v. Randall*, 357 U.S. 513, 529 (1958); *see SEC v. Jarkesy*, 603 U.S. 109, 162 n.2 (2024) (Gorsuch, J., concurring) (it would be unconstitutional for a statute to "route criminal prosecutions through executive"

bodies). The DTO regime is exactly that, and its failure to provide criminal process violates due process.

### B. Even if designation were not criminal punishment, Plaintiffs' designations violated their right to procedural due process.

Alternatively, Florida's designations violate the Fourteenth Amendment because they deprive Plaintiffs of constitutionally protected liberty and property interests on the basis of "constitutionally inadequate process." *Afr. People's Educ. & Def. Fund, Inc. v. Pinellas Cnty.*, 184 F.4th 1194, 1214 (11th Cir. 2026). To determine whether process is constitutionally inadequate, courts weigh three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.[7]

All three factors favor Plaintiffs. The district court erred in concluding otherwise.

**First**, the private interests affected by Florida's designations are of the highest order. The designations have forced Plaintiffs to end their Florida

[7] There is no dispute that Plaintiffs' designations deprive them of constitutionally protected liberty and property interests. App.17.

operations and cut off their constitutionally protected speech and association. *See supra*, pp. 11-14. These designations "are the practical equivalents of confiscation and death sentences." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 142 (1951) (Black, J., concurring).

Plaintiffs' interests dwarf the private interest at stake in *National Council of Resistance of Iran v. Department of State*, 251 F.3d 192, 206-09 (D.C. Cir. 2001) ("*NCRI*")—the crux of the district court's procedural due process analysis. App.17-19. In *NCRI*, the D.C. Circuit determined what process the Constitution required before the federal government deprived a designated foreign terrorist organization ("FTO") of a "small bank account." *NCRI*, 251 F.3d at 201. The small bank account was the sole interest on the private side of the ledger. *NCRI*, 251 F.3d at 196, 205. Plaintiffs' private interests, including their First Amendment and property interests, are orders of magnitude greater.[8]

**Second**, the DTO regime's procedures are so feeble that the risk of erroneous designations, like Plaintiffs', is extraordinarily high. To designate Plaintiffs, Florida officials had to make a "finding" that Plaintiffs are engaged in terrorist activity. Fla. Stat. § 943.03102. Yet Plaintiffs never had the chance to

---

[8] Although the D.C. Circuit recognized that an FTO's members cannot enter the United States, and that U.S. law prohibits providing material support to an FTO, the court expressly declined to hold that those additional consequences of designation were cognizable under the Fifth Amendment. *Contra* App.18-19.

meaningfully contest that "finding": they submitted written objections, but had no way to obtain discovery, take depositions, present live testimony, or cross-examine the witnesses against them.

For that reason, Florida's DTO-designation process is irreconcilable with *Jenkins v. McKeithen*, 395 U.S. 411, 427-29 (1969).[9] *Jenkins*—unlike the federal designation cases on which Defendants and the district court relied—involved a state executive "Commission" that was authorized to "find named individuals guilty of violating the criminal laws of Louisiana and the United States and to brand them as criminals in public." *Id.* at 427-28. The commission's procedures "severely limit[ed] the right of a person being investigated to confront and cross-examine the witnesses against him," and "drastically limit[ed] the right of a person investigated to present evidence on his own behalf." *Id.* at 428-29. Those limitations violated the Constitution: "due process require[d]" the commission to, at minimum, "afford a person being investigated the right to confront and cross-examine the witnesses against him, subject only to traditional limitations on those rights." *Id.* at 429. So too, here.

---

[9] *Jenkins* did not produce a majority opinion. Chief Justice Warren and Justice Brennan joined a plurality opinion authored by Justice Marshall. Justices Douglas and Black concurred, joining the plurality in all relevant respects. *Jenkins*, 395 U.S. at 432.

The district court acknowledged *Jenkins* only in a footnote, dismissing it on the grounds that "a DTO designation is not a criminal adjudication." App.19. But *Jenkins* is directly on point, *regardless* of whether the Court concludes that a DTO designation is criminal punishment. The commission in *Jenkins* looks precisely like the regime here, which authorizes a handful of state officials to "find" that "named" U.S. groups are "guilty of violating the criminal laws of [Florida] and the United States and to brand them as criminals in public." 395 U.S. at 427-28.

Critically, the state-court appeal briefly available to Plaintiffs following their designations would not have remedied the deficient DTO process. *Cf.* App.21. For one thing, as both parties have explained, any appeal of Plaintiffs' designations under the DTO regime would have been limited to the record compiled by the State Executive Defendants: no discovery, depositions, live testimony, or cross-examination. *See* App.254 (57:10-13). For another, even near-instant preliminary relief would not have prevented Plaintiffs' constitutional injuries. The first day Plaintiffs could have gone to state court was October 6. But Defendants' vote approving designation harmed Plaintiffs before then. In response to the vote, on October 5, a student group cancelled an event with CAIR-Florida. App.190 (¶ 3); *see United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 56 (1993) (post-deprivation hearing inadequate). Other First Amendment harms began even earlier—including the departure of senior employees responsible for community

engagement and advocacy, reputational damage hurting relationships with donors, and curtailment of legal services. App.52-54 (¶¶ 38-41); App. 81-86 (¶¶ 55-67).

**Finally**, Defendants do not dispute that the only legitimate government interest even arguably at stake in Plaintiffs' designations is the state's ordinary interest in preventing crime. This distinguishes Florida's DTO regime from the federal FTO and Specially Designated Global Terrorist ("SDGT") designation programs—contrary to Defendants' assertions and the district court's analysis. App.18-20.

The FTO and SDGT designation programs are rooted in uniquely federal authorities. *See* PL 104-132 § 301(a)(1)-(3), April 24, 1996, 110 Stat. 1214 (Article I powers are basis for FTO program); H.R. Rep. 107-236, pt. 1, at 62 (2001) (power over international commerce is basis for statute underlying SDGT program). Because both federal programs are aimed at foreign groups, FTOs and SDGTs can almost never raise constitutional claims based on their designations. On the rare occasions when FTOs and SDGTs have challenged their designations on due-process grounds, courts have been acutely sensitive to the unique federal interests involved—including the power to conduct foreign affairs and commerce, control immigration, and maintain classified information. *See Reno*, 205 F.3d at 1137 (limitations on judicial review in federal regime are "necessary concomitant of the foreign affairs power"); *Islamic Am. Relief Agency*, 477 F.3d at 734

(describing review as "extremely deferential" due to foreign policy and national security implications). Likewise, courts have been cognizant of the ways in which "[i]ndividuals are subject to limitations in their relations with foreign governments and entities that differ from any found in the domestic setting." Gov't Reply, *HLP*, 2010 WL 565212, at *40-41.

Florida has no comparable interests. Defendants do not, and cannot reasonably, contend that providing Plaintiffs with more robust procedural protections, pre- and post-designation, would be infeasible or otherwise undermine Florida's general law-enforcement interest. And unlike in the handful of cases involving the federal designation regimes, there is *nothing else* on the government-interest side of the ledger.

## III. The remaining factors governing emergency relief weigh strongly in favor of Plaintiffs.

Plaintiffs are suffering, and will continue to suffer, severe and irreparable constitutional injuries because of their DTO designations. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271-72 (11th Cir. 2006) (loss of First Amendment freedoms is irreparable harm). They pose no harm to state security; Plaintiffs do not engage in terrorist activity and have never been charged with any crime, App.42 (¶ 5); App.68 (¶ 4); App.187 (¶ 2); App.190 (¶ 2), and the state has not identified how it believes Plaintiffs threaten public safety. An injunction pending appeal will not harm others. To the contrary, declining to grant relief will

cause significant and irreparable harm to the many people and organizations associated with Plaintiffs and other ordinary Floridians who benefit from Plaintiffs' legal services and advocacy. And the state has no countervailing interest in enforcing an unconstitutional law.

## CONCLUSION

For these reasons, the Court should grant Plaintiffs' motion.

Dated: November 10, 2026

Respectfully submitted,

*/s/ Ashley Gorski*

Ashley Gorski
Hina Shamsi
Patrick Toomey
Charles Hogle
Celin Carlo-Gonzalez
Natalie Smith
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
agorski@aclu.org

Daniel B. Tilley
**ACLU FOUNDATION OF FLORIDA**
4343 West Flagler Street, Ste. 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org

Scott D. McCoy
Aaron Fleisher
Diego A. Soto
Mary Ella W. Simmons
**SOUTHERN POVERTY LAW CENTER**
400 Washington Ave
Montgomery, AL 31604
(786) 347-2056
scott.mccoy@splcenter.org

Manoj S. "Sachin" Varghese
Mark L. Bailey
Kayla Polonsky Gannon
**BONDURANT, MIXSON & ELMORE, LLP**
1201 W. Peachtree St. NW, Ste. 3900
Atlanta, GA 30309
(404) 881-4100
varghese@bmelaw.com

*Attorneys for Plaintiffs–Appellants*

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies as follows:

1. This motion contains 7,935 words, excluding the parts of the document exempted by Rule 32(f), in accordance with Plaintiffs–Appellants' motion for excess words, which requested a word limit of 7,950 words and was filed simultaneously with this motion.

2. This motion complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6).

Dated: November 10, 2026

*/s/ Ashley Gorski*
Ashley Gorski
American Civil Liberties Union Foundation

*Attorney for Plaintiffs–Appellants*