**No. 26-14146**

# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

CAIR-Foundation, Inc., *et al.*,

*Plaintiffs–Appellants*,

v.

Ron DeSantis, *et al.*,

*Defendants–Appellees.*

On appeal from the United States District Court for the Northern District of Florida — No. 4:26-cv-521 (Judge Winsor)

**BRIEF OF *AMICI CURIAE* KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY AND THE FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION IN SUPPORT OF PLAINTIFFS–APPELLANTS' TIME-SENSITIVE MOTION FOR INJUNCTION PENDING APPEAL**

Anna Diakun
Xiangnong (George) Wang
Alex Abdo
Jameel Jaffer
Knight First Amendment Institute at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
anna.diakun@knightcolumbia.org

*Counsel for Amici Curiae*

*CAIR-Foundation, Inc. v. DeSantis*, No. 26-14146

**Certificate of Interested Persons and Corporate Disclosure Statement**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, *amici curiae* Knight First Amendment Institute at Columbia University and Foundation for Individual Rights and Expression certify that the following have an interest in the outcome of this appeal:

1. Abdo, Alex, *Counsel for Amici Curiae*
2. American Civil Liberties Union Foundation, *Counsel for Plaintiffs–Appellants*
3. American Civil Liberties Union Foundation of Florida, *Counsel for Plaintiffs–Appellants*
4. Bailey, Mark Langenbach, *Counsel for Plaintiffs–Appellants*
5. Bakkedahl, Thomas, *Defendant–Appellee*
6. Bartlett, Bruce, *Defendant–Appellee*
7. Basford, Larry, *Defendant–Appellee*
8. Bondurant Mixson & Elmore LLP, *Counsel for Plaintiffs–Appellants*
9. Brodsky, Ed, *Defendant–Appellee*
10. CAIR Florida, Inc., *Plaintiff–Appellant*
11. CAIR-Foundation, Inc., *Plaintiff–Appellant*
12. Campbell, Jack, *Defendant–Appellee*

13. Carlo-Gonzalez, Celin Alejandra, *Counsel for Plaintiffs–Appellants*
14. Cooper & Kirk, PLLC, *Counsel for Defendants–Appellees*
15. Cooper, Charles J., *Counsel for Defendants–Appellees*
16. Cox, Alexcia, *Defendant–Appellee*
17. Craine, Jessica Paige, *Counsel for Defendants–Appellees*
18. DeSantis, Ron, *Defendant–Appellee*
19. Dewhirst, David Morgan Steven, *Counsel for Defendants–Appellees*
20. Diakun, Anna, *Counsel for Amici Curiae*
21. Durrett, John, *Defendant–Appellee*
22. Fleisher, Aaron Saul, *Counsel for Plaintiffs–Appellants*
23. Florida Attorney General's Department of Legal Affairs' Office of Statewide Prosecution, *Implements Challenged Statutory Regime*
24. Florida Attorney General's Office, *Counsel for Defendants–Appellees*
25. Foundation for Individual Rights and Expression, *Amicus Curiae*
26. Fox, Amira, *Defendant–Appellee*
27. Gannon, Kayla Polonsky, *Counsel for Plaintiffs–Appellants*
28. Gladson, Bill, *Defendant–Appellee*
29. Gorski, Ashley Marie, *Counsel for Plaintiffs–Appellants*
30. Gustafson, Tyler Evan, *Counsel for Defendants–Appellees*

31. Haas, Brian, *Defendant–Appellee*
32. Hogle, Charles, *Counsel for Plaintiffs–Appellants*
33. Ingoglia, Blaise, *Defendant–Appellee*
34. Jaffer, Jameel, *Counsel for Amici Curiae*
35. Keefe, Larry, *Defendant–Appellee*
36. Knight First Amendment Institute at Columbia University, *Amicus Curiae*
37. Kramer, Brian, *Defendant–Appellee*
38. Larizza, R.J., *Defendant–Appellee*
39. Lopez, Susan, *Defendant–Appellee*
40. Madden, Ginger Bowden, *Defendant–Appellee*
41. McCoy, Scott D., *Counsel for Plaintiffs–Appellants*
42. Moss, Nicole Jo, *Counsel for Defendants–Appellees*
43. Muehlhoff, Jason John, *Counsel for Defendants–Appellees*
44. Nelson, Melissa, *Defendant–Appellee*
45. Pryor, Harold, *Defendant–Appellee*
46. Ramer, John Duross, *Defendant–Appellee*
47. Rundle, Katherine Fernandez, *Defendant–Appellee*
48. Scheiner, William, *Defendant–Appellee*

49. Shamsi, Hina, *Counsel for Plaintiffs–Appellants*
50. Simmons, Mary Ella Wright, *Counsel for Plaintiffs–Appellants*
51. Simpson, Wilton, *Defendant–Appellee*
52. Smith, Natalie Grace Mary, *Counsel for Plaintiffs–Appellants*
53. Soto, Diego Armando, *Counsel for Plaintiffs–Appellants*
54. Southern Poverty Law Center, *Counsel for Plaintiffs–Appellants*
55. Tilley, Daniel Boaz, *Counsel for Plaintiffs–Appellants*
56. Toomey, Patrick Christopher, *Counsel for Plaintiffs–Appellants*
57. Uthmeier, James, *Defendant–Appellee*
58. Varghese, Manoj Sam "Sachin," *Counsel for Plaintiffs–Appellants*
59. Walters, Riley William, *Counsel for Defendants–Appellees*
60. Wang, Xiangnong "George," *Counsel for Amici Curiae*
61. Ward, Dennis, *Defendant–Appellee*
62. Winsor, Hon. Allen, *District Court Judge for the Northern District of Florida*
63. Worrell, Monique, *Defendant–Appellee*

The Knight First Amendment Institute at Columbia University and the Foundation for Individual Rights and Expression certify that they have no parent corporation and that no publicly held corporation owns 10 percent or more of their

stock. The Knight First Amendment Institute at Columbia University and the Foundation for Individual Rights and Expression further certify that no publicly traded company or corporation has an interest in the outcome of the case or appeal.

Dated: November 12, 2026

*/s/ Anna Diakun*
Anna Diakun
Knight First Amendment Institute at
Columbia University

*Counsel for Amici Curiae*

**Table of Contents**

Interest of *Amici Curiae* .......... 1

Statement of the Issue .......... 1

Summary of the Argument .......... 2

Argument .......... 2

I. The DTO regime grants state officials nearly unfettered discretion to designate organizations they disfavor. .......... 2

II. The DTO regime is an affront to the First Amendment, and allowing Plaintiffs' designations to remain in effect will cause irreparable constitutional harm. .......... 4

III. Upholding the DTO regime would threaten all organizations that are politically unpopular. .......... 7

Conclusion .......... 12

Certificate of Compliance .......... 13

# Table of Authorities

## Cases

*Bates v. City of Little Rock*, 361 U.S. 516 (1960) .................................................. 9

*Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294 (1955) ................................ 7

*Elrod v. Burns*, 427 U.S. 347 (1976) ........................................................................ 7

*Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539 (1963) ......................... 10

*Matal v. Tam*, 582 U.S. 218 (2017) ......................................................................... 5

**NAACP v. Ala. ex rel. Flowers*, 377 U.S. 288 (1964) ........................................... 9

*NAACP v. Button*, 371 U.S. 415 (1963) ................................................................. 10

**NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449 (1958) ........................ 8, 9

*NRA v. Vullo*, 602 U.S. 175 (2024) ........................................................................ 11

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) .................................................... 12

*State of La. ex rel. Gremillion v. NAACP*, 181 F. Supp. 37 (E.D. La. 1960) ................................................................................................................ 9

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) .................................... 5

## Statutes

Fla. Stat. § 775.33 (2026) ..................................................................................... 5, 6

Fla. Stat. § 943.03102 (2026) ................................................................................. 3, 4

## Other Authorities

Andrew Cuomo (@NYGovCuomo), X (Apr. 20, 2018, 11:58 AM), https://perma.cc/T5YH-V8SX ........................................................................ 11

CAIR-Florida Home Page, https://perma.cc/RM2T-864Y ....................................... 5

Gavin Newsom (@GavinNewsom), X (Jan. 25, 2023, 1:51 PM), https://perma.cc/28PV-WMFH ........ 11

Jenn Bernstein, *Gov. Malloy: 'NRA has become a terrorist organization,'* FOX61 (Mar. 6, 2018), https://perma.cc/XB5J-9L9C ........ 11

Michael J. Klarman, *From Jim Crow to Civil Rights: The Supreme Court and the Struggle for Racial Equity* (2004) ........ 8, 9, 10, 11

Michael L. Gillette, *The NAACP's Impact on Civil Rights in Texas*, Handbook of Texas Online, https://perma.cc/J3GF-8R5Y ........ 10

*NAACP: A Century in the Fight for Freedom*, Libr. of Cong., https://perma.cc/PCF2-7EY4 ........ 8

Press Release, CAIR and CAIR-Florida Will Appeal Federal Court Decision Denying Relief from Florida's Unconstitutional "Terrorist" Designation Regime, ACLU (Nov. 5, 2026), https://perma.cc/W4BU-K3EU ........ 6

**Rules**

Fla. Admin. Code R. 11RER26-8 (2026) ........ 3, 4, 6

## Interest of *Amici Curiae*

The Knight First Amendment Institute at Columbia University is a non-partisan, not-for-profit organization that works to defend the freedoms of speech and the press in the digital age. The Institute aims to promote an open and inclusive system of free expression that fosters effective self-government. The Institute also filed an *amicus* brief in *CAIR Foundation v. DeSantis*, No. 26-10735 (11th Cir.).

The Foundation for Individual Rights and Expression ("FIRE") is a nonpartisan nonprofit that defends the rights of all Americans to free speech and thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended freedom of expression nationwide without regard to speakers' political views. As such, FIRE is deeply concerned by the State's claim of authority to apply viewpoint-based designations that effectively require organizations to cease expressive and associative activity within the jurisdiction.[1]

## Statement of the Issue

1. Whether this Court should grant Plaintiffs an injunction pending appeal.

[1] No counsel for a party authored this brief in whole or in part. No party or party's counsel contributed money toward the preparation or submission of the brief. No person other than *amici curiae*, their members, or their counsel contributed money toward the preparation or submission of the brief.

## Summary of the Argument

Florida's new domestic terrorist organization designation regime (the "DTO regime") grants five state officials nearly unfettered discretion to designate any group in the United States a "domestic terrorist organization," effectively banishing that group from the state and criminalizing a wide range of constitutionally protected speech and association. The DTO regime violates the First Amendment, and absent this Court's swift intervention, Plaintiffs—the nation's largest Muslim civil rights organization and its Florida chapter—along with the many Floridians who wish to engage with them, will continue to suffer irreparable harm to their First Amendment rights. Furthermore, unless this Court intervenes, Florida's designation of Plaintiffs will pave the way for new state campaigns of political retribution.

## Argument

### I. The DTO regime grants state officials nearly unfettered discretion to designate organizations they disfavor.

Florida's DTO regime gives a small number of officials nearly unfettered discretion to designate organizations they dislike as "domestic terrorist organizations" and, thereby, to compel those organizations to cease their operations and prohibit others from associating with them.

To begin, the statute lacks a crucial substantive limitation: though the statute nominally cabins designations to organizations that are "engaging in terrorist activity" that is "an ongoing threat to the security of" Florida or the United States,

Fla. Stat. § 943.03102(1)(a)(1) (2026), it does not set any evidentiary standard for these determinations. In a prosecution for terrorist offenses, Florida would have to prove its case beyond a reasonable doubt. But under the DTO regime, Florida's Chief of Domestic Security can propose a designation based on pure speculation, intuition, or even political disagreement. The only check on his discretion is a majority vote of the Governor and Florida's three-member Cabinet. *Id.* § 943.03102(2)(d).; Fla. Admin. Code R. 11RER26-8(1) (2026). Accordingly, in Florida, any organization can be labeled a "domestic terrorist organization" if a handful of executive officials decide to make it so. *See id.* In this case, the Governor and the Cabinet summarily approved Plaintiffs' designations without any discussion of the evidence supposedly underpinning the decisions. App.98–99.

Next, the statute does not impose adequate pre-deprivation procedural safeguards because targeted organizations are not guaranteed a meaningful opportunity to be heard. After a targeted organization receives notice of the intent to designate, it may submit written objections—but it is not guaranteed access to all evidence against it while preparing those objections. *See* 11RER26-8(2). Moreover, there is no guarantee that the opportunity to object will be anything more than a formality. To proceed, the Governor and Cabinet must hold a meeting to "consider" the notice of intent, but whether the organization is allowed to argue its case, or even attend, is within their "sole discretion." *Id.* In this case, Plaintiffs were allowed to

attend the public meeting, but not permitted to speak, and the entire process lasted about thirty seconds. App.98–99.

The DTO regime also fails to guarantee meaningful judicial review. Most significantly, it does not require pre-deprivation judicial review. The burden is on the organization to challenge its designation, and the organization has only 30 days after publication of the designation—until the day the designation goes into effect—to do so. Fla. Stat. § 943.03102(2)(f); 11RER26-8(3). The regime does not require Florida's courts to resolve the challenge before the designation goes into effect or otherwise provide for a stay of the effective date. This means that the designation is very likely to go into effect—and to cause irreparable harm—before judicial review is complete. Moreover, the DTO regime does not guarantee that any eventual judicial review will be rigorous: it is silent as to the standard of review, the burden of proof, the availability of a hearing, and the designated organization's entitlement to see and confront the evidence against it. The designated organization is not even permitted to call witnesses or conduct discovery; review is deferential and limited to the administrative record. App.254.

## II. The DTO regime is an affront to the First Amendment, and allowing Plaintiffs' designations to remain in effect will cause irreparable constitutional harm.

The DTO regime does precisely what the First Amendment was designed to prevent: it authorizes government officials to suppress speech and association they

do not like. As the Supreme Court has made clear, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943); *see also Matal v. Tam*, 582 U.S. 218, 246 (2017) (opinion of Alito, J.). Yet Florida's regime vests broad discretion in the hands of a small number of politically motivated individuals to do just that.

The DTO regime severely burdens the expressive activities of designated organizations and the Floridians who wish to engage with them.

The consequences for the designated organization itself are immediate, wide-ranging, and irreparable. For example, under the state's material support prohibition, it is illegal to provide "personnel" to a designated organization, which means to "[w]ork under [its] direction and control" or to "[o]rganize, manage, supervise, or otherwise direct [its] operations." Fla. Stat. § 775.33(3), (5)(a) (2026). It is illegal, in other words, to work for a designated organization, and an organization without staff cannot operate. Unsurprisingly, CAIR-Florida suspended its operations in the state as of November 5, the effective date of its designation. *See* CAIR-Florida Home Page, https://perma.cc/RM2T-864Y.[2]

---

[2] *Amici* agree with Plaintiffs that Plaintiffs and those seeking to engage with them would also risk prosecution under the Criminal Gang Enforcement and Prevention

Designation also severely burdens the First Amendment rights of the Floridians who wish to engage with designated organizations, in at least two ways. First, the DTO regime makes it criminal for Floridians to engage in speech that would constitute a prohibited "service" within the meaning of the DTO regime. *Id.* § 775.33(1)(d). Given the breadth of this prohibition, Florida law schools would risk liability for inviting CAIR to speak about its civil rights advocacy. Florida newspapers could face charges for publishing a CAIR-Florida op-ed denouncing the designations. And Floridians wishing to support Plaintiffs' advocacy might be subject to punishment. In fact, the law's prohibitions are so broad that it appears that—but for the State's agreement not to prosecute Plaintiffs' *amici* and the district court's limited injunction[3]—it would violate the statute to file this submission. *See* 11RER26-8(5) (not exempting *amicus* submissions).

Second, Floridians' ability to hear from or associate with designated organizations is severely burdened when targeted organizations are inevitably forced to cease operations in the state. Now that CAIR-Florida has shut down, for instance,

Act. *See* Pls.–Appellants' Time-Sensitive Mot. for Injunction Pending Appeal 18–20, ECF No. 5-1.

[3] *See* Press Release, CAIR and CAIR-Florida Will Appeal Federal Court Decision Denying Relief from Florida's Unconstitutional "Terrorist" Designation Regime, ACLU (Nov. 5, 2026), https://perma.cc/W4BU-K3EU (describing non-prosecution agreement); App.36–37.

Floridians can no longer participate in the faith-driven education programs or the advocacy activities that it would have facilitated.

For all these reasons, Florida's designations of Plaintiffs are causing ongoing, irreparable harm—to Plaintiffs and to all Floridians who wish to associate with them. As the Supreme Court has explained, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

## III. Upholding the DTO regime would threaten all organizations that are politically unpopular.

Upholding Florida's DTO regime would set a dangerous precedent. On Defendants' logic, any state could pass a law empowering executive officers—without meaningful substantive or procedural safeguards—to bar the operation of organizations they determine threaten the state's interests. That kind of power would threaten groups across the ideological spectrum.

Unfortunately, there are historical precedents for Florida's regime, but those precedents are now rightly viewed as shameful departures from our constitutional tradition. One apt example is the concerted effort by many states to shut down the NAACP in the 1950s and 1960s. Following the decision in *Brown v. Board of Education of Topeka, Kansas*, 349 U.S. 294 (1955), the NAACP led the

desegregation effort in the South by bringing enforcement actions.[4] In response, several Southern states took aggressive legal action against the organization to impede its operation or halt it altogether.[5] Though the Supreme Court eventually invalidated many of these efforts, litigation took years, severely hampering the organization in the meantime.

The protracted litigation in *NAACP v. Alabama* provides a window into this history. In 1956, the Attorney General of Alabama sued the organization in state court, seeking to "oust" it from the state for allegedly failing to comply with a business registration statute. *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 451–52 (1958). On the same day, the assigned judge barred the NAACP from "engaging in further activities" within Alabama pending resolution of the case. *Id.* at 452–53.

At the outset of the lawsuit, the court ordered the production of the NAACP's membership list, which the organization refused to disclose. *Id.* at 453–54. When the issue reached the Supreme Court two years later, the Court sided with the NAACP, holding that compelling the organization to disclose its membership list would be unconstitutional. *Id.* at 462–63. The Court declined to rule on the merits of the case,

---

[4] Michael J. Klarman, *From Jim Crow to Civil Rights: The Supreme Court and the Struggle for Racial Equity* 352 (2004).

[5] *NAACP: A Century in the Fight for Freedom*, Libr. of Cong., https://perma.cc/PCF2-7EY4.

however, because the state court had not yet considered the issue—meaning that the NAACP continued to be barred from operating within Alabama. *Id.* at 466–67.

The NAACP was unable to obtain a state court hearing on the merits until 1961, when the court permanently enjoined the organization from operating within Alabama. *See NAACP v. Alabama ex rel. Flowers*, 377 U.S. 288, 292 (1964). It wasn't until 1964—on the suit's fourth trip to the Supreme Court—that the Court took up that question. *See generally id.* Again, the Court sided with the NAACP, stating that the case "involves not the privilege of a corporation to do business in a State, but rather the freedom of individuals to associate for the collective advocacy of ideas." *Id.* at 309. Thus, the NAACP was ultimately vindicated—but not until Alabama had blocked it from operating in the state for eight years.

Alabama was not the only state to employ these kinds of tactics. In Louisiana, the NAACP was temporarily enjoined from operating for failure to disclose its membership list.[6] *See State of La. ex rel. Gremillion v. NAACP*, 181 F. Supp. 37, 38–39 (E.D. La. 1960) (describing procedural history). In Arkansas, representatives of local branches were convicted and fined for the same reason. *See Bates v. City of Little Rock*, 361 U.S. 516, 517–18, 527 (1960) (reversing convictions). In Florida, the president of the Miami branch was convicted of contempt and sentenced to prison

[6] Klarman, *supra* note 4, at 352.

because he refused to testify before a legislative committee about the chapter's membership records. *See Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539, 547–48, 557–58 (1963) (reversing conviction). In Texas, the NAACP was temporarily enjoined from operating because of its alleged failure to pay a franchise tax and for engaging in barratry.[7] And in Virginia, legislators targeted the organization by expanding the state's definition of "improper solicitation of legal business" to encompass NAACP practices. *See NAACP v. Button*, 371 U.S. 415, 424–25 (1963) (ruling in favor of the NAACP). During internal Supreme Court discussion of that case, Justice Hugo Black summed up the stakes: The "NAACP is finished if this law stands."[8]

In most of these cases, the states used neutral administrative requirements to suppress the NAACP's litigation and advocacy. Though these and other state efforts to target the NAACP were for the most part invalidated, they caused considerable damage to the organization in the meantime. Even when the organization was not barred from operating altogether, state efforts to force the NAACP to disclose its membership, coupled with private harassment of identified members, led to a sharp decline in membership. According to one source, the NAACP's southern

[7] Klarman, *supra* note 4, at 352; Michael L. Gillette, *The NAACP's Impact on Civil Rights in Texas*, Handbook of Texas Online, https://perma.cc/J3GF-8R5Y.

[8] Klarman, *supra* note 4, at 338.

membership dropped from 128,000 members to 80,000 between 1955 and 1957, and nearly 250 local branches shuttered.[9]

History has not judged these episodes kindly. But if this Court blesses Florida's DTO regime, history will almost certainly repeat itself, with targets across the political spectrum. Today, it is CAIR, but tomorrow, it may very well be the NRA, which has been in the crosshairs of other state officials, with one governor calling the organization "trash" and envisioning it becoming "obsolete,"[10] another claiming that it had "in essence become a terrorist organization,"[11] and a third describing it as "an extremist organization."[12] *See also NRA v. Vullo*, 602 U.S. 175, 181–84 (2024). If states are allowed to go down this path, powers like the ones Florida claims could be used and abused by officials of all political stripes. Even if these efforts are ultimately invalidated, targeted organizations will not come away unscathed. Litigation is expensive and time-consuming; instead of spending their time and money on advocacy, targeted organizations will need to divert resources toward their defense. And regardless of their ultimate success, they may experience

---

[9] *Id.* at 383.

[10] Gavin Newsom (@GavinNewsom), X (Jan. 25, 2023, 1:51 PM), https://perma.cc/28PV-WMFH.

[11] Jenn Bernstein, *Gov. Malloy: 'NRA has become a terrorist organization,'* FOX61 (Mar. 6, 2018), https://perma.cc/XB5J-9L9C.

[12] Andrew Cuomo (@NYGovCuomo), X (Apr. 20, 2018, 11:58 AM), https://perma.cc/T5YH-V8SX.

reputational harm and declines in their membership and reach. Smaller organizations, in particular, may be unable to withstand these pressures.

Unless this Court intervenes, Florida's designation of Plaintiffs will pave the way for new state campaigns of political retribution. The First Amendment exists to prevent such abuses, by withdrawing from the government the power to "drive certain ideas or viewpoints from the marketplace." *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 387–88 (1992) (citations omitted).

**Conclusion**

For the foregoing reasons, *amici curiae* respectfully urge this Court to grant Plaintiffs' motion.

Dated: November 12, 2026

Respectfully submitted,

/s/ *Anna Diakun*

Anna Diakun
Xiangnong Wang
Alex Abdo
Jameel Jaffer
Knight First Amendment Institute at
Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
anna.diakun@knightcolumbia.org

*Counsel for Amici Curiae*

## Certificate of Compliance

This brief complies with the type-volume limit of the Federal Rules of Appellate Procedure 29(a)(5), 27(d)(2), and 32(g)(1) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 2576 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Microsoft Word in 14-point Times New Roman font, a proportionally spaced typeface.

Dated: November 12, 2026

*/s/ Anna Diakun*
Anna Diakun

*Counsel for Amici Curiae*