No. 26-14146

# In the United States Court of Appeals for the Eleventh Circuit

CAIR-FOUNDATION, INC., et al.,

*Plaintiffs-Appellants*,

v.

RON DESANTIS, et al.,

*Defendants-Appellees*.

**DEFENDANTS-APPELLEES' RESPONSE IN OPPOSITION TO PLAINTIFFS' TIME-SENSITIVE MOTION FOR INJUNCTION PENDING APPEAL**

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA, NO. 4:26-CV-521 (WINSOR, J.)

CHARLES J. COOPER
JOHN D. RAMER
NICOLE J. MOSS
RILEY W. WALTERS
JESSICA CRAINE

**COOPER & KIRK, PLLC**
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
ccooper@cooperkirk.com

JAMES UTHMEIER
*Attorney General*
DAVID M.S. DEWHIRST
*Solicitor General*
JASON J. MUEHLHOFF
*Chief Deputy Solicitor General*
TYLER E. GUSTAFSON
*Assistant Solicitor General*

**OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA**
The Capitol, PL-01
Tallahassee, FL 32399-1050
Tel: (850) 414-3300
david.dewhirst@myfloridalegal.com

*Counsel for Defendants-Appellees*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

BACKGROUND ........ 4

I. CAIR's Well-Documented History of Terrorism ........ 4

II. The State of Florida Designates CAIR as a Domestic Terrorist Organization ........ 8

A. The terrorist-designation process ........ 8

B. Florida designates CAIR as a domestic terrorist organization ........ 10

C. The district court largely denies CAIR's motion for a preliminary injunction ........ 11

LEGAL STANDARD ........ 12

ARGUMENT ........ 13

I. CAIR Is Unlikely To Succeed on the Merits of Its First Amendment Claims ........ 13

A. Because the designation regulates conduct, its practical effect on speech and association does not trigger First Amendment scrutiny ........ 13

B. The designation and DTO regime do not implicate, much less violate, CAIR's freedom of association ........ 19

C. The designation is not a prior restraint, so CAIR's unbridled-discretion argument fails ..... 26

D. The designation and DTO regime would satisfy any level of scrutiny ..... 30

II. CAIR Is Unlikely To Succeed on the Merits of Its Due Process Claim ..... 33

A. Designation is not a criminal punishment ..... 33

B. CAIR received all the process it is due ..... 34

III. Equitable Factors Do Not Support CAIR's Requested Relief ..... 39

CONCLUSION ..... 41

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Abbott v. Perez*,
585 U.S. 579 (2018) .................... 38, 39

*Access Now, Inc. v. Sw. Airlines Co.*,
385 F.3d 1324 (11th Cir. 2004) .................... 12, 17, 38

*Al Haramain Islamic Found., Inc. v. Dep't of Treasury*,
686 F.3d 965 (9th Cir. 2012) .................... 26, 37

*Alexander v. United States*,
509 U.S. 544 (1993) .................... 26, 27

**Arcara v. Cloud Books, Inc.*,
478 U.S. 697 (1986) .................... 15, 16, 17, 18, 19, 22, 25, 27, 28

*Atlanta J. & Const. v. City of Atlanta Dep't of Aviation*,
322 F.3d 1298 (11th Cir. 2003) .................... 18

*Ayotte v. Planned Parenthood of N. New England*,
546 U.S. 320 (2006) .................... 24

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) .................... 25, 28, 29

*Bell v. City of Winter Park*,
745 F.3d 1318 (11th Cir. 2014) .................... 29

*Boim v. Holy Land Found. for Relief & Dev.*,
549 F.3d 685 (7th Cir. 2008) .................... 21

*City of Deerfield Beach v. Vaillant*,
419 So. 2d 624 (Fla. 1982) .................... 37

*Comput. & Commc'ns Indus. Ass'n v. Uthmeier*,
--- F.4th ---, 2026 WL 3071065 (11th Cir. Oct. 14, 2026) .................... 31

*Fla. v. Dep't of Health & Hum. Servs.*,
19 F.4th 1271 (11th Cir. 2021) ........................................................ 12

*Healy v. James*,
408 U.S. 169 (1972) ........................................................................ 26

**Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010) .....................................1, 20, 21, 22, 23, 24, 31, 32

**Holy Land Found. for Relief & Dev. v. Ashcroft*,
333 F.3d 156 (D.C. Cir. 2003)........................... 15, 21, 35, 36, 37, 38

*Hudson v. United States*,
522 U.S. 93 (1997) ................................................................... 33, 34

**Humanitarian L. Project v. Reno*,
205 F.3d 1130 (9th Cir. 2000) ......................20, 23, 27, 28, 29, 30, 36

**Islamic Am. Relief Agency v. Gonzales*,
477 F.3d 728 (D.C. Cir. 2007)....................................... 14, 15, 21, 38

*Jarrard v. Sheriff of Polk Cnty.*,
115 F.4th 1306 (11th Cir. 2024) ............................................... 26, 29

*Jenkins v. McKeithen*,
395 U.S. 411 (1969) ........................................................................ 37

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ................................................................. 34, 37

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*,
460 U.S. 575 (1983) ........................................................................ 18

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ........................................................................ 23

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982) ........................................................................ 24

*_Nat'l Council of Resistance of Iran v. Dep't of State_,
251 F.3d 192 (D.C. Cir. 2001)................................ 34, 35, 36, 37, 38

_Nat'l Rifle Ass'n of Am. v. Vullo_,
602 U.S. 175 (2024) ............................................................ 25

_Norwegian Cruise Line Holdings, Ltd. v. State Surgeon Gen., Fla. Dep't of Health_,
50 F.4th 1126 (11th Cir. 2022)............................................. 14

_Ohio Citizens for Responsible Energy, Inc. v. NRC_,
479 U.S. 1312 (1986) ..................................................... 12, 39

_Paul v. Davis_,
424 U.S. 693 (1976) ....................................................... 37, 39

*_People's Mojahedin Org. of Iran v. Dep't of State_,
327 F.3d 1238 (D.C. Cir. 2003).................................. 15, 21, 35, 36

_Respect Maine PAC v. McKee_,
562 U.S. 996 (2010) ....................................................... 12, 39

_Sapuppo v. Allstate Floridian Ins. Co._,
739 F.3d 678 (11th Cir. 2014) ............................................. 25

_Seling v. Young_,
531 U.S. 250 (2001) ............................................................ 34

_Shuttlesworth v. City of Birmingham_,
394 U.S. 147 (1969) ............................................................ 29

_TikTok Inc. v. Garland_,
604 U.S. 56 (2025) .............................................................. 19

_Turner Broad. Sys., Inc. v. FCC,_
520 U.S. 180 (1997) ....................................................... 30, 31

_United States v. Afshari_,
446 F.3d 915 (9th Cir. 2006) ................................................ 28

*United States v. El-Mezain*,
664 F.3d 467 (5th Cir. 2011) ........................................ 21, 37

*United States v. Holy Land Found. for Relief & Dev.*,
2009 WL 10680203 (N.D. Tex. July 1, 2009) ........................ 5, 6, 7

*United States v. Melvin*,
918 F.3d 1296 (11th Cir. 2017) ........................................ 34

*United States v. O'Brien*,
391 U.S. 367 (1968) ........................................ 19

*United States v. Ursery*,
518 U.S. 267 (1996) ........................................ 33

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) ........................................ 29

*Whole Woman's Health v. Jackson*,
595 U.S. 30 (2021) ........................................ 40, 41

*Wisconsin v. Mitchell*,
508 U.S. 476 (1993) ........................................ 17

**Statutes and Codes**

50 U.S.C.

§ 1705(c) ........................................ 21, 26

FLA. STAT.

§ 617.1420 ........................................ 4, 24

§ 617.1420(1)(f) ........................................ 10

§ 775.30(1)(a) ........................................ 14

§ 775.33 ........................................ 24

§ 775.33(1)(d) ........ 22

§ 775.33(3) ........ 9, 20

§ 775.34(2) ........ 24

§ 823.05(2)(b) ........ 25

§ 823.05(2)(c) ........ 25

§ 874.03(1) ........ 9, 10

§ 874.03(4)(a) ........ 9, 10, 22

§ 874.03(8)(a) ........ 9, 10

§ 874.05(1)(a) ........ 25

§ 874.10 ........ 4, 9, 10, 22

§ 943.03102(1) ........ 8

§ 943.03102(1)(a) ........ 32, 38

§ 943.03102(1)(a)(1) ........ 14

§ 943.03102(2)(a) ........ 8, 9

§ 943.03102(2)(b) ........ 9

§ 943.03102(2)(d) ........ 9

§ 943.03102(2)(e) ........ 9

§ 943.03102(2)(f) ........ 9, 35

§ 943.03102(3)(a) ........ 9, 35

§ 1002.421(1)(t)(3)(c) .................................................................. 40

§ 1002.421(1)(t)(3)(d) .................................................................. 40

§ 1003.035 .................................................................................. 40

**Other Authorities**

*CAIR-LA, Special Dispatch No. 11238*, MEMRI (Mar. 28, 2024), https://tinyurl.com/4tx9bt3t ............................................................ 7, 8

Disassociation from Council on American-Islamic Relations, H.R. 1209, 118th Cong. at 4 (2024), https://perma.cc/FZ9E-X2DT .................... 7

Emergency Rule 11RER26-8, 52 Fla. Admin. Reg. 3963 (Sep. 14, 2026) ............................................................ 9, 11, 12, 24, 35

Exec. Order No. 13224, 66 Fed. Reg. 49,079 (Sep. 23, 2001) ........... 21, 26

*FDLE Cabinet Packages* (Sep. 29, 2026), https://perma.cc/5F7J-FCUB ....................................................... 10

Image posted by Abdullah Jaber of CAIR-Florida (@iamabdullahjaber), INSTAGRAM (Oct. 7, 2023), https://perma.cc/NPP4-3H26............ 7, 8

Jason Trahan, *Judge due to rule on Holy Land defense challenge*, DALLAS MORNING NEWS (Oct. 14, 2008), 2008 WLNR 19527769, https://perma.cc/WRJ3-5TK8 ..................................................... 7

Lorenzo Vidino, *The Muslim Brotherhood in America: A Brief History* (July 2025), https://perma.cc/E2C2-7D6B ...................................... 1

Meeting Agenda for the Palestine Committee, July 30, 1994, Government Exhibit Elbarasse Search-19 at 6, 8, *United States v. Holy Land Found. for Relief & Dev.*, No. 3:04-CR-240-G (N.D. Tex.), https://perma.cc/EC7A-BHTR.............................................. 6

## INTRODUCTION

The Council on American-Islamic Relations was founded as a front for Hamas and the Muslim Brotherhood—organizations widely known to "systematically conceal their activities behind charitable, social, and political fronts" that they then use to support their "terrorist operations." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 30–31 (2010) (cleaned up). CAIR emerged from a 1993 meeting among members of the Muslim Brotherhood's U.S.-based network, a meeting convened to conspire over how to support Hamas while avoiding scrutiny from federal law enforcement.[1] CAIR's part in the conspiracy: to provide political cover to other front groups and influence the American public to either adopt their false narratives or remain silent, all while masquerading, in its own words to this Court, as a run-of-the-mill "civil rights organization[] that advocate[s] for religious liberty and the equal treatment of Muslims." Mot. for Inj. Pending Appeal ("Mot."), Doc. 5-1 at 1. Nothing to see here.

But the mask is off. In the late 2000s, the Department of Justice concluded that CAIR provided material support to Hamas and listed

[1] Lorenzo Vidino, *The Muslim Brotherhood in America: A Brief History* 20, 23, 25–26 (July 2025), https://perma.cc/E2C2-7D6B.

CAIR as an unindicted co-conspirator in the largest terrorism-financing prosecution in American history. In that groundbreaking, two-month trial, several entities and individuals, including the co-founder of CAIR's Texas chapter, were convicted for supporting Hamas, and a federal court found there was "ample evidence" of CAIR's involvement. Since then, numerous officials, employees, and affiliates of CAIR have been arrested or deported for, and even convicted of, terrorist activities. And despite years of attempting to project a different image, in November 2023 CAIR's Executive Director, Nihad Awad, betrayed CAIR's true purpose by saying he was "happy to see" the October 7th terrorist attacks, in which Hamas brutally murdered not just 1,200 Israelis, but also 46 American citizens. Supp.App.45–46.

In response to CAIR's well-documented, extensive, and ongoing involvement in terrorist activities, the State of Florida designated CAIR, including its local affiliate, CAIR-Florida (collectively, "CAIR"), as a domestic terrorist organization under Florida law. The designation followed an administrative process in which CAIR had an opportunity to object and to appeal the designation to state court before it became effective on November 5. CAIR declined to pursue that appeal. It instead

filed this federal action, raising a host of constitutional claims and echoing the same false narrative it was founded to propagate: that it is an ordinary civil rights organization and that any claim otherwise is rank "Islamophobia," Supp.App.162 (¶ 120)—a signature slur that CAIR has weaponized against critics for decades. Worn-out rhetoric aside, CAIR's legal arguments have no merit.

Two preliminary points. First, as the district court explained, CAIR has made strategic litigation choices that narrow the issues presently before the Court. Whether CAIR is "in fact" a terrorist organization is not at issue. App.7. CAIR chose not to challenge that administrative finding in state court. Moreover, CAIR moved below for preliminary relief on a "relatively narrow" set of claims, App.8, not including its First Amendment retaliation claim, so the complaint's allegations of political "animus"—which CAIR now tries to smuggle in before this Court—also "are not presently at issue," App.6. And CAIR has even abandoned here its content-based discrimination claim on which it secured limited relief below.

Second, CAIR's request for relief against the "DTO regime" is really a request for relief against several distinct actions and provisions—

namely, the designation itself, 16 different sections of the Florida statutes, and an emergency regulation implementing the designation statute. Mot. at 1 n.1. Accordingly, any claim that CAIR asserts against one provision (*e.g.*, FLA. STAT. § 874.10) does not necessarily apply to another provision (*e.g.*, FLA. STAT. § 617.1420) or to the designation itself. The upshot is that any supposed defect in one aspect of the "DTO regime" does not necessarily upend the whole framework.

All that said, CAIR's motion fails for the reasons the district court gave. The designation's practical *effect* on CAIR's protected speech and association does not implicate the First Amendment at all, for the designation targets non-expressive conduct. None of the related statutes punish mere association, either facially or as applied. Nor is the designation a prior restraint, as it does not forbid any specific speech in advance. And CAIR received all the process it was due, even though it chose to forgo a key part of that process. The Court should deny the motion.

## BACKGROUND

### I. CAIR's Well-Documented History of Terrorism

CAIR purports to be "the largest Muslim civil-rights organization

in the country." Mot. at 2. That is the same false cover the organization was founded to hide behind. The truth is much darker.

CAIR was conceived as a front group for Hamas and the Muslim Brotherhood. The Muslim Brotherhood is a radical transnational Islamist organization that seeks to impose Islamic, or "Sharia," law worldwide through any and all means, including terrorism. Supp.App.55–56. In the late 1980s, the Muslim Brotherhood created Hamas, a terrorist group dedicated to destroying the state of Israel. Supp.App.18–19. Beyond Hamas, the Muslim Brotherhood boasts a vast support apparatus, with a presence in the United States, that works to further the Brotherhood's vision of a "grand Jihad . . . destroying the Western civilization from within and sabotaging its miserable house by their hands and the hands of the believers so that it is eliminated." *United States v. Holy Land Found. for Relief & Dev.*, 2009 WL 10680203, at *7 (N.D. Tex. July 1, 2009) (quoting 1991 Shura Council Memo).

To that end, in 1993, a coalition of entities under the Muslim Brotherhood's umbrella, known collectively as the "Palestine Committee," met in Philadelphia to plot how to advance the Brotherhood's goals in America and support Hamas through front

organizations. *Id.* at *8–9; Supp.App.24. During the meeting, which was wiretapped by the FBI, the so-called "Palestine Committee" agreed to create another front organization based in Washington, D.C.—one that would appear to be an independent and legitimate representative of the Islamic community in the United States but would work covertly with the Committee to support Hamas and serve as a cover for the existing organizations. Supp.App.24–27. Months later, two participants at the Philadelphia meeting—including Nihad Awad, who still serves as CAIR's Executive Director—formally established CAIR. Supp.App.27. In its own words, the Palestine Committee, which now included CAIR, tied itself "in a clear manner with the Brothers" and agreed to operate in "complete coordination" rather than as "a separate movement from the mother Group."[2]

The prosecution of the Holy Land Foundation for Relief and Development ("HLF") in 2008—the largest terrorism-financing prosecution in American history—further confirmed CAIR's role in the

[2] Meeting Agenda for the Palestine Committee, July 30, 1994, Government Exhibit Elbarasse Search-19 at 6, 8, *United States v. Holy Land Found. for Relief & Dev.*, No. 3:04-CR-240-G (N.D. Tex.), https://perma.cc/EC7A-BHTR.

pro-Hamas conspiracy. In that prosecution, the Texas-based HLF and five of its officials were convicted of funneling millions of dollars to Hamas through purported charities. One of those officials was Ghassan Elashi, who attended the 1993 Philadelphia meeting and co-founded CAIR's Texas chapter. At trial, an FBI agent testified that CAIR is a "front group for Hamas."[3] Indeed, the Department of Justice named CAIR as an unindicted co-conspirator in the scheme, and the trial court found "ample evidence" to support it. *Holy Land Found.*, 2009 WL 10680203, at *7–9. In the ensuing years, numerous individuals associated with CAIR have been convicted of terrorism and related crimes.[4] And CAIR is still part of the conspiracy it was founded to perpetuate, as evidenced by the sordid responses of Awad and other leaders to the October 7th massacre, which parroted Hamas's efforts to legitimize the atrocities. Supp.App.45–46.[5]

---

[3] Jason Trahan, *Judge due to rule on Holy Land defense challenge*, DALLAS MORNING NEWS (Oct. 14, 2008), 2008 WLNR 19527769, https://perma.cc/WRJ3-5TK8.

[4] Disassociation from Council on American-Islamic Relations, H.R. 1209, 118th Cong. at 4 (2024), https://perma.cc/FZ9E-X2DT.

[5] *See* Image posted by Abdullah Jaber of CAIR-Florida (@iamabdullahjaber), INSTAGRAM (Oct. 7, 2023), https://perma.cc/NPP4-3H26; *CAIR-LA, Special Dispatch No. 11238*, MEMRI (Mar. 28, 2024),

## II. The State of Florida Designates CAIR as a Domestic Terrorist Organization.

In April 2026, Governor DeSantis signed HBs 1471 and 1473 (collectively, the "designation statute") into law. The statute took effect on July 1, 2026. It was modeled after, and is materially indistinguishable from, the laws governing terrorist designations at the federal level.

### A. The terrorist-designation process

Florida's designation statute creates a multi-step process for designating domestic terrorist organizations ("DTOs"). First, the Chief of Domestic Security ("Chief") of the Florida Department of Law Enforcement ("FDLE") must find that (a) the "organization is based or operates in [Florida] or the United States," (b) the "organization is engaging in terrorist activity as defined in [Fla. Stat. §] 775.30," and (c) the "terrorist activity of the organization is an ongoing threat to the security of this state or the United States." FLA. STAT. § 943.03102(1).

Second, the Chief "must provide written notice to the Governor and Cabinet of his or her intent to designate an organization." *Id.* § 943.03102(2)(a). That notice "must be accompanied by a summary of

---

https://tinyurl.com/4tx9bt3t.

the basis for such designation," *id.*, and "any materials relating to the notice of intent that are not confidential, exempt, or otherwise protected from disclosure," Emergency Rule 11RER26-8, 52 Fla. Admin. Reg. 3963, 3967 (Sep. 14, 2026). The Chief must also provide the notice to the organization itself if possible, which then has an opportunity to object. FLA. STAT. § 943.03102(2)(b); 52 Fla. Admin. Reg. at 3967.

Third, the Governor and Cabinet may hold a meeting to vote on whether to approve the proposed designation. FLA. STAT. § 943.03102(2)(d). If they approve, the Chief "must publish notice of the designation in the Florida Administrative Register" within seven days. *Id.* § 943.03102(2)(e). A designation takes effect 30 days after publication, 52 Fla. Admin. Reg. at 3967–68, and during those 30 days the organization may appeal the designation to state circuit court, FLA. STAT. § 943.03102(2)(f). A DTO may also petition FDLE "at any time" for removal of the designation. *Id.* § 943.03102(3)(a).

Designation may serve as a factual predicate for further action. For example, it is a crime for a person to "knowingly provide[] material support or resources to a . . . domestic terrorist organization." *Id.* § 775.33(3). In certain circumstances, a DTO may also qualify as a

"[c]riminal gang," and it is a crime to "knowingly initiate[], organize[], plan[], finance[], direct[], manage[], or supervise[] criminal gang-related activity." *Id.* §§ 874.03(1), (4)(a), (8)(a), 874.10. And, among other things, DTOs are subject to administrative dissolution. *See id.* § 617.1420(1)(f). The net effect of a designation, as the court below noted, is "closure of all [CAIR's] Florida operations." App.8.

### B. Florida designates CAIR as a domestic terrorist organization.

On September 18, 2026, the Chief provided CAIR notice of intent to designate it as a DTO, which listed decades' worth of publicly available evidence that CAIR is a front for, and materially supports, Hamas and terrorism as part of a broader conspiracy. *See* App.105–11. In response, CAIR submitted written objections, which were reviewed and added to the Cabinet meeting agenda and package. *See* App.114.[6] On September 29, the Governor and Cabinet voted to approve the designation of CAIR, along with the Muslim Brotherhood, Antifa, and other well-known terrorist organizations.[7] CAIR moved for preliminary relief in federal

---

[6] *FDLE Cabinet Packages* (Sep. 29, 2026), https://perma.cc/5F7J-FCUB.

[7] *Id.*

court on October 2.

### C. The district court largely denies CAIR's motion for a preliminary injunction.

After full briefing and oral argument, the district court denied CAIR's motion for a preliminary injunction on November 4. The court held that CAIR was unlikely to succeed on the merits, with one narrow exception: CAIR's claim that the material-support statute bans receipt of "expert advice" in the form of legal counsel and thus regulates speech based on content "as applied to [CAIR's] receipt of legal services." App.35. The court did not enjoin any other applications of the material-support statute because, "[a]side from litigation activity," CAIR "d[id] not offer specificity as to any other 'expert advice' [it] wish[es] to receive" that would be protected speech yet barred by the statute. *Id.*

Accordingly, the district court enjoined Defendants "from taking any action to enforce" the material-support statute "based on the provision of legal services to" CAIR. App.36–37. The limited nature of "[t]he relief available," the court noted, is in part "a product of [CAIR's] litigation choices." App.35.[8]

[8] The implementing regulation also makes clear that "the provision of legal counsel or legal support services" in connection with litigation

## LEGAL STANDARD

An injunction pending appeal is an "extraordinary and drastic remedy" that requires the movant to "clearly" establish "(1) a substantial likelihood that it will prevail on the merits of the appeal; (2) a substantial risk of irreparable injury to the movant unless the injunction is granted; (3) no substantial harm to other interested persons; and (4) no harm to the public interest." *Fla. v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1279 (11th Cir. 2021) (cleaned up). It "demands a significantly higher justification than a request for a stay" and should be granted "sparingly" and "only where the legal rights at issue are indisputably clear." *Respect Maine PAC v. McKee*, 562 U.S. 996, 996 (2010) (cleaned up); *Ohio Citizens for Responsible Energy, Inc. v. NRC*, 479 U.S. 1312, 1312 (1986) (Scalia, J., in chambers) (cleaned up). A movant cannot prevail on the merits with arguments it failed to preserve. *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) (collecting cases).

---

concerning a "designation" or "criminal prosecution" is not grounds for prosecution. 52 Fla. Admin. Reg. at 3968.

# ARGUMENT

## I. CAIR Is Unlikely To Succeed on the Merits of Its First Amendment Claims.

CAIR contends that the designation and related statutory framework ("DTO regime") (1) suppress CAIR's associational rights; (2) operate as a prior restraint on CAIR's speech, a problem exacerbated by the Executive Branch's allegedly unbridled discretion to designate; and (3) fail under any level of scrutiny. None of this has merit.

### A. Because the designation regulates conduct, its practical effect on speech and association does not trigger First Amendment scrutiny.

Most of CAIR's First Amendment argument rests on the designation's practical effect: it forces CAIR to "shut down operations in Florida altogether," "extinguish[ing]" its associations and "ending an enormous amount of protected speech." Mot. at 13, 20. The main theme of CAIR's brief is that because it engages in expressive activity, any regulation that hinders its operations necessarily regulates expressive activity. Acceptance of such a sweeping theory of First Amendment protection would enable terrorist organizations—and others engaged in unlawful conduct—to use their speech as a shield against plainly legitimate regulation.

**1.** Through CAIR's designation and the enforcement of related statutes, the State regulates conduct—terrorist activity—not First Amendment speech or association. And "[s]tatutes that regulate non-expressive conduct do not implicate the First Amendment at all even if they incidentally burden speech." *Norwegian Cruise Line Holdings, Ltd. v. State Surgeon Gen., Fla. Dep't of Health*, 50 F.4th 1126, 1135 (11th Cir. 2022) (cleaned up).

Statutory text confirms the point. Designation requires findings that an "organization is engaging in terrorist *activity*" that poses "an ongoing threat to the security of this state or the United States." FLA. STAT. § 943.03102(1)(a)(1) (emphasis added). "Terrorist activity," in turn, means "an *activity*" that involves "[a] violent *act* or an *act* dangerous to human life which is a violation of the criminal laws of this state or of the United States." *Id.* § 775.30(1)(a) (emphasis added). Designation thus turns not on words, but on acts that threaten public security. And that is precisely why CAIR was designated.

Because CAIR does not seek to challenge the factual basis or reason for its designation at this stage, *see* App.6–8, its First Amendment claims "lose their footing," as "there is no First Amendment right nor any other

constitutional right to support terrorists," *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 735 (D.C. Cir. 2007) (quoting *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 166 (D.C. Cir. 2003) (*HLF*)); *see id.* at 736–37 (blocking assets of a domestic group found to support terrorism "does not implicate [its] First Amendment right of association").

And that is true even if the regulation "incidentally burden[s]" First Amendment activity, *Norwegian Cruise*, 50 F.4th at 1135, such as when "the consequences of the [terrorist] designation" burden protected speech and association, *People's Mojahedin Org. of Iran v. Dep't of State*, 327 F.3d 1238, 1244 (D.C. Cir. 2003). What matters is that "[i]t is conduct and not communication that the statute controls." *Id.*

The Supreme Court proved the point in *Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986), when it held that "the First Amendment [wa]s not implicated" by the forced closure of a bookstore whose premises were also used for prostitution, even though bookselling is protected speech. *Id.* at 707. The Supreme Court declined to apply even intermediate scrutiny because the closure had nothing to do with speech; it was based on "sexual activity" that "manifest[ed] absolutely no element of protected

expression." *Id.* at 705. So too here—the designation has nothing to do with CAIR's protected speech or association but with its terrorist activity that, like prostitution, "manifests absolutely no element of protected expression." *Id.*

It made no difference in *Arcara* that "the effect of the statutory closure remedy" stifled the bookstore's "First Amendment protected bookselling activities." *Id.* As the Court put it, to hold that such an effect implicates the First Amendment "proves too much," as "every civil and criminal remedy imposes some conceivable burden on First Amendment protected activities." *Id.* at 705–06 (reasoning that "a thief who is sent to prison might complain that his First Amendment right to speak in public places has been infringed because of the confinement," but to no avail). What mattered was that "[t]he legislation providing the closure sanction was directed at unlawful conduct having nothing to do with books or other expressive activity." *Id.* at 707.

**2.** CAIR's responses all fail. *First*, CAIR says that state action triggers scrutiny whenever it "substantially burdens association, even if the state is targeting something else." Mot. at 14 (cleaned up). But each case it cites involved a law that *directly* regulated association: by

compelling a group to admit an unwanted member (*Dale*), to disclose its membership list (*Bates*), or to stop soliciting civil-rights plaintiffs (*Button*). None involved an *incidental* burden caused by regulating unprotected, unlawful conduct.

*Second*, CAIR asserts that it was designated "because of [its] religious views, speech, and advocacy." *Id.* at 15. But that is the theory behind CAIR's retaliation claim, on which it expressly did *not* seek preliminary relief, so the allegation is "not presently at issue." App.6; *see Access Now*, 385 F.3d at 1331.[9]

*Third*, CAIR argues that the designation "disproportionately burdens" expression by shutting it down altogether. Mot. at 20. But *Arcara* makes clear that "disproportionate burden" is not measured by the severity of the burden on the individual plaintiff. After all, in *Arcara*, the bookstore was also forced to close.

*Arcara* explains what it meant by "disproportionate burden" when

[9] Nothing in the record before the Court would support a finding that the State designated CAIR based on its political or religious views. CAIR cites the notice of intent, *see* Mot. at 15 (citing App.104–11), but the conspiracy outlined there is not protected association, nor does the First Amendment prohibit the evidentiary use of speech to prove a conspiracy, *see Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993).

it discussed the special ink tax in *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575 (1983): the "tax had the effect of *singling out* newspapers to shoulder its burden," so "the burden of the tax inevitably fell disproportionately—in fact, almost exclusively—upon the shoulders of newspapers exercising the constitutionally protected freedom of the press." *Arcara*, 478 U.S. at 704 (emphasis added). "It was this targeted, unique tax that presented and particularized the constitutional problem." *Atlanta J. & Const. v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298, 1310 (11th Cir. 2003).

The designation statute, like the nuisance law in *Arcara*, establishes a generally applicable framework for combatting unlawful conduct. Unlike the tax in *Minneapolis Star*, the statute does not single out a class of speakers for special regulation, such that the burden systematically and disproportionately falls on expressive activity. That the designation applies to a particular organization changes nothing; the closure order in *Arcara* did too. Any "differential treatment" does not trigger First Amendment scrutiny because it is "justified by some special characteristic of the" regulated entity, *Minneapolis Star*, 460 U.S. at 585—terrorism here, prostitution in *Arcara*—that is *not* protected

expression. *Arcara*, 478 U.S. at 705.[10]

*Fourth*, CAIR invokes *Arcara*'s references to laws that burden "a particular political opinion" or target specific "conduct with a significant expressive element." Mot. at 20 (cleaned up). Those principles come from *United States v. O'Brien*, 391 U.S. 367 (1968), and govern the regulation of expressive conduct, *see Arcara*, 478 U.S. at 701–02, 706 (citing *O'Brien*). But terrorist activity, again, "manifests absolutely no element of protected expression." *Id.* at 705.

### B. The designation and DTO regime do not implicate, much less violate, CAIR's freedom of association.

To evade *Arcara*, CAIR pivots from the designation to specific statutes in the DTO regime—chiefly, the criminal-gang statute—the enforcement of which, CAIR says, "explicitly target association." Mot. at 18. CAIR misreads the statutes.

**1.** CAIR fails to cite a single statutory provision that punishes mere

[10] Likewise, in *TikTok Inc. v. Garland*—where the Supreme Court assumed without deciding that the First Amendment was implicated—the law at issue singled out for special regulation an entity whose entire function is to both engage in and host protected expression. 604 U.S. 56, 69 (2025). A law targeting entities engaged in terrorist activity or prostitution—regardless whether those entities also engage in protected speech—is "different in kind." *Id.*

association with a DTO. Take the material-support statute, which bars persons from "knowingly provid[ing] material support or resources to a designated . . . domestic terrorist organization." FLA. STAT. § 775.33(3). In holding that the virtually identical *federal* ban on material support to foreign terrorist organizations does not implicate U.S. citizens' freedom of association, the Supreme Court reasoned that "the statute does not penalize mere association" but instead "the act of giving material support." *Holder*, 561 U.S. at 39 (quoting *Humanitarian L. Project v. Reno*, 205 F.3d 1130, 1133 (9th Cir. 2000)).

Contrary to CAIR's contention, *see* Mot. at 16 & n.4, *Holder*'s dicta regarding domestic organizations appeared in its free-speech analysis, where the Court actually applied strict scrutiny and noted without deciding that the analysis might cash out differently for domestic organizations, *see* 561 U.S. at 39. The Court's association holding, which appears in the next section of the opinion, was a categorical and threshold ruling: the statute does not even *implicate* the freedom of association because it "does not penalize mere association," so "decisions scrutinizing penalties on simple association or assembly are . . . inapposite." *Id.* The

same goes for Florida's statute.[11]

Other circuits agree. *See HLF*, 333 F.3d at 164–66; *Islamic Am. Relief Agency*, 477 F.3d at 736–37; *People's Mojahedin Org. of Iran*, 327 F.3d at 1244–45; *see also Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 698 (7th Cir. 2008) (en banc). None of these cases relied on foreign-affairs powers in rejecting the freedom-of-association claims, *contra* Mot. at 16–17, and some involved domestic organizations. One such organization was HLF, which, like CAIR, "held itself out as the largest Muslim charitable organization in the United States." *United States v. El-Mezain*, 664 F.3d 467, 483 (5th Cir. 2011). And far from imposing a minimal burden on HLF's associational activity, the designation effectively shut it down, blocking all its assets and criminalizing conducting business with it. *See HLF*, 333 F.3d at 160; Exec. Order No. 13224, § 2, 66 Fed. Reg. 49,079, 49,080 (Sep. 23, 2001); 50 U.S.C. § 1705(c).

**2.** CAIR tries to find stronger footing for its association claim in

---

[11] CAIR asserts that *Holder* "relied on 'the same reasons' in resolving the plaintiffs' speech *and* association claims," Mot. at 16 n.4, but that language addressed a *separate* argument made by the plaintiffs, *see Holder*, 561 U.S. at 40.

Florida's criminal-gang statute. *See* Mot. at 12, 18–20. The main provision is Section 874.10, which prohibits "knowingly initiat[ing], organiz[ing], plan[ning], financ[ing], direct[ing], manag[ing], or supervis[ing] criminal gang-related activity," FLA. STAT. § 874.10, defined as "activity committed with the intent to benefit, promote, or further the interests of a criminal gang," *id.* § 874.03(4)(a). For five reasons, this statute does not help CAIR's case.

First, CAIR conceded below that the statute "does not substantially affect [its] association claim," which turns primarily on CAIR being "completely shut down." App.26 n.8; App.228–29 (31:20–32:6). And under *Arcara*, the shutdown does not implicate the First Amendment.

Second, like the material-support statute, the criminal-gang statute "does not penalize mere association." *Holder*, 561 U.S. at 39. It instead penalizes the *act* of directing or initiating activity intended to further a criminal gang's interests. FLA. STAT. §§ 874.03(4)(a), 874.10. If that implicated association, so would the material-support statute, because the latter bars similar activity—*e.g.*, donating to, working for, leasing office space to, banking with, or training a DTO. *See id.* § 775.33(1)(d). Yet *Holder* held that such activity is *not* mere association.

561 U.S. at 39; *see Reno*, 205 F.3d at 1133.

Third, even if the statute could, in theory, sweep more broadly than the material-support statute and penalize mere association, CAIR's as-applied challenge still fails because CAIR never specifies a particular course of mere associational activity it seeks to undertake that the statute would criminalize. *Cf. Holder*, 561 U.S. at 36 (evaluating "the particular speech plaintiffs propose to undertake"). It posits only that anyone who directs "protected associational activity" to further CAIR's interests "commits a felony." Mot. at 12. As the court below noted, this assertion is "entirely hypothetical" and "phrased at such a high level of generality" that it cannot support a "pre-enforcement challenge." *Holder*, 561 U.S. at 24–25, 37–38; App.35.

Fourth, CAIR has also not carried its burden for a facial challenge to the criminal-gang statute. Facial challenges are "hard to win," *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024), and CAIR once again fails to even "cite *Moody*, much less walk through the two-step process it requires," App.12. The effort would have been futile regardless, because the conduct prohibited by the criminal-gang statute, like the conduct prohibited by the material-support statute, "most often does not take the

form of speech" or association "at all." *Holder*, 561 U.S. at 26. So even if there were a few invalid applications of the statute, that would not justify enjoining *all* enforcement of it. *See Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006) (noting that courts should "enjoin only the unconstitutional applications of a statute while leaving other applications in force").

Finally, the criminal-gang statute's validity has no bearing on the designation itself and other aspects of the DTO regime, such as the material-support statute (FLA. STAT. § 775.33) or the dissolution statute (FLA. STAT. § 617.1420). A conclusion that the criminal-gang statute is unconstitutional (facially or as applied) would thus not affect the rest of the DTO regime.

**3.** Other provisions cited by CAIR likewise do not target mere association. *Contra* Mot. at 15. Unlike in *Noto*, for example, Section 775.34(2) does not prohibit mere membership—rather, it incorporates *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 920 (1982), penalizing only one who "willfully becomes a member . . . with the intent to further the illegal acts of the organization." FLA. STAT. § 775.34(2); 52 Fla. Admin. Reg. at 3968. In any event, CAIR told the district court that it is not a

membership-based organization, so this provision is apparently irrelevant. *See* Supp.App.74. Similarly, even if recruitment constitutes protected association, Section 874.05 does not punish mere recruitment, but rather recruitment "where a condition of membership . . . is the commission of any crime." FLA. STAT. § 874.05(1)(a). And the nuisance abatement provision, *id.* § 823.05(2)(b)–(c), does not implicate the First Amendment at all, *see Arcara*, 478 U.S. at 705–07.

**4.** Finally, CAIR relies on the anti-coercion principle. *See* Mot. at 12–13. But CAIR failed to preserve this argument below, relegating it to a single sentence in its preliminary-injunction motion. *See* Supp.App.99; *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014). Accordingly, the district court did not even mention coercion in its opinion.

In any event, there is no coercion here because the State is not "coerc[ing] a private party to punish or suppress disfavored speech on [the State's] behalf." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024). Coercion requires government action aimed at suppressing speech—like the commission in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), which pressured distributors to stop circulating specific

publications it found objectionable, *id.* at 60–63.

The designation, again, targets CAIR's *conduct*, not its expression. Federal law likewise prohibits persons from materially supporting or doing business with a designated entity, including domestic ones. *See* Exec. Order No. 13224, § 2, 66 Fed. Reg. at 49,080; 50 U.S.C. § 1705(c); *Al Haramain Islamic Found., Inc. v. Dep't of Treasury*, 686 F.3d 965, 979–80 (9th Cir. 2012) (noting that the designation of a domestic nonprofit barred all persons from doing business with it). Yet no court has invalidated the federal law as unconstitutionally coercive.

### C. The designation is not a prior restraint, so CAIR's unbridled-discretion argument fails.

A prior restraint "forbid[s] certain communications . . . in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (emphasis omitted). Said differently, a prior restraint targets protected First Amendment activity by regulating it before it takes place, such as by conditioning specific expression or access to a forum on a license or official permission. *See Healy v. James*, 408 U.S. 169, 184–85 (1972); *Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306, 1321 (11th Cir. 2024).

CAIR's designation is not a prior restraint because it was

"not . . . imposed on the basis of an advance determination that" specific speech "is prohibited." *Arcara*, 478 U.S. at 705 n.2. To the contrary, the designation "has nothing to do with any expressive conduct at all." *Id.*; *see Reno*, 205 F.3d at 1136–37.

CAIR's contrary view, *see* Mot. at 21, "stretches the term 'prior restraint' well beyond the limits established by [the Supreme Court's] cases" and would "virtually obliterate the distinction . . . between prior restraints and subsequent punishments," *Alexander*, 509 U.S. at 549–50. On CAIR's logic, any civil or criminal remedy that burdens future speech would be a prior restraint, such that a prison inmate suffers a prior restraint on his ability to speak in public places. *See Arcara*, 478 U.S. at 706. That is not the law.

CAIR resists this implication by gerrymandering its rule: designation is a prior restraint, CAIR says, because it "change[s] the legal status of protected speech and association on a prospective basis." Mot. at 22 (emphasis omitted). But terrorist designations at the federal level do that too by converting previously lawful speech (*e.g.*, monetary donations) into unlawful material support. *See Reno*, 205 F.3d at 1133. Yet no court has ever suggested that federal designations are

unconstitutional prior restraints—not even the dissent on which CAIR relies, which accepted that designations *legitimately* change the legal status of speech and objected only to prosecutions that rest on procedurally deficient designations. *See United States v. Afshari*, 446 F.3d 915, 917, 922 (9th Cir. 2006) (Kozinski, J., dissenting from denial of rehearing en banc). And if more were needed, *Reno* (also authored by Judge Kozinski) held that designations are not like licensing schemes, 205 F.3d at 1136–37, and *Alexander* and *Arcara* both rejected the "prior restraint" label even though the challenged actions changed the legal status of expressive activity.

CAIR qualifies its rule still further by identifying the problem as the lack of "sufficient legal process" to constrain "executive discretion," relying on *Bantam Books*. Mot. at 22–23. But the commission there effectively approved or vetoed specific publications before they could reach the public, which is the functional equivalent of a licensing scheme. *Bantam Books*, 372 U.S. at 59–63. The lack of procedural safeguards mattered because of what the commission was doing: reviewing specific speech before it occurred and deciding whether to permit or proscribe it. And not just any speech, but speech the commission deemed "obscene,"

which the Court said cannot be regulated without "the most rigorous procedural safeguards." *Id.* at 65–66 (collecting cases). CAIR's assertion that *Bantam Books* "involved a regulation of *unprotected* speech" (Mot. at 24) is thus misleading and irrelevant—the commission was still targeting speech, not conduct, and the speech was never properly adjudicated to be obscene.

Because the designation is not a prior restraint, CAIR's unbridled-discretion argument is homeless. Unbridled discretion is a First Amendment problem *only* in the context of prior restraints, such as "licensing schemes" or their functional equivalent. *Reno*, 205 F.3d at 1136; *see also Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969); *Ward v. Rock Against Racism*, 491 U.S. 781, 793 (1989); *Jarrard*, 115 F.4th at 1321; *Bell v. City of Winter Park*, 745 F.3d 1318, 1324–25 (11th Cir. 2014) (ordinance empowered private citizens to prevent protests near their residences for any reason, including viewpoint-based reasons).

At any rate, the Governor and Cabinet cannot designate any organization merely on their say-so. As the Ninth Circuit explained in rejecting a similar challenge to the similarly worded federal designation

statute, "[t]he statute authorizes the [Executive Branch] to designate only those groups that engage in terrorist activities," which "is not so vague or indeterminate" a standard "as to give the [Executive Branch] unfettered discretion." *Reno*, 205 F.3d at 1137. And as explained below, Florida law establishes meaningful checks on their designation authority, including the opportunity to seek judicial review before the designation takes effect. *See infra* Part II.B. If those checks are insufficient, then the federal designation regime would likewise be infected by "unbridled discretion" and thus fall with Florida's framework.

Because the designation is not a prior restraint, the "three procedural protections" that CAIR seeks do not fit. Mot. at 24–25. For example, it makes no sense to force the State to prove in court "that the speech it seeks to prohibit is unprotected" because the designation does not seek to "prohibit" speech in the first place. *Id.*

### D. The designation and DTO regime would satisfy any level of scrutiny.

For all the reasons given above, the Court should not apply First Amendment scrutiny to the DTO regime. But Florida's designation laws would pass any level of scrutiny.

Starting with intermediate scrutiny, *see Turner Broad. Sys., Inc. v.*

*FCC*, 520 U.S. 180, 189 (1997), the State's interest here—combatting terrorism—is "an urgent objective of the highest order," *Holder*, 561 U.S. at 28, and "unrelated to the suppression of free speech," *Turner*, 520 U.S. at 189; *see supra* Part I.A.

The DTO regime is also narrowly tailored to Florida's interest in combatting terrorism. Under intermediate scrutiny, the government has "latitude in designing a regulatory solution," and a "less-restrictive-alternative analysis" is not "part of the inquiry." *Turner*, 520 U.S. at 213, 217 (cleaned up); *see Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, --- F.4th ---, 2026 WL 3071065, at *14 & n.10 (11th Cir. Oct. 14, 2026) (distinguishing *McCullen v. Coakley* and reaffirming this point).

Florida's legislature, like Congress, reasonably chose designation as a tool against terrorist organizations, which "systematically conceal their activities behind charitable, social, and political fronts." *Holder*, 561 U.S. at 30 (cleaned up). "Hamas" in particular "use[s] its overt political and charitable organizations as a financial and logistical support network for its terrorist operations." *Id.* at 31 (cleaned up). Ordinary criminal prosecution—CAIR's preferred alternative—is ill-suited to combatting front groups that hide behind advocacy and charitable work.

Criminal prosecution also serves a different purpose: it punishes past offenses, while designation addresses an ongoing threat. FLA. STAT. § 943.03102(1)(a).

Relatedly, "[i]t is not difficult to conclude" that the "taint" of a terrorist organization's activities "is so great" that Florida's designation scheme is a reasonable response. *Holder*, 561 U.S. at 30 (cleaned up). Even seemingly benign services "lend legitimacy" to a terrorist organization, "legitimacy that makes it easier for [it] to persist, to recruit members, and to raise funds—all of which facilitate more terrorist" activity. *Id.*

CAIR contests that *Holder*'s reasoning applies to domestic, no less than foreign, organizations. Mot. at 29. But two of the three rationales accepted by *Holder*—that money and services are fungible, freeing up resources for violence, and that support lends legitimacy to terrorist organizations—rest on economic and practical logic that applies equally to domestic organizations. *Holder*, 561 U.S. at 30–31. Moreover, because the statute in *Holder* passed strict scrutiny, it follows, *a fortiori*, that the same rationales support the DTO regime under intermediate scrutiny.

But even if the Court applied strict scrutiny, the analysis could rest on all the reasons given here.

## II. CAIR Is Unlikely To Succeed on the Merits of Its Due Process Claim.

The procedures afforded to CAIR fully satisfy the requirements of due process. CAIR's demand for more—a full-blown criminal trial, or at least a trial-like proceeding—is not constitutionally required before a designation is made. Accepting CAIR's arguments would doom not only Florida's designation statute, but also the *federal* designation regime.

### A. Designation is not a criminal punishment.

CAIR now downplays its lead argument below—that designation is criminal punishment requiring pre-designation indictment, confrontation, and a jury verdict of guilty beyond a reasonable doubt. The district court rightly rejected this theory. *See* App.13–17.

CAIR's few points on appeal need not detain the Court. A civil sanction does not become criminal merely because the underlying conduct is. App.16; s*ee also, e.g.*, *United States v. Ursery*, 518 U.S. 267, 292 (1996); *Hudson v. United States*, 522 U.S. 93, 105 (1997). Nor does designation automatically make a DTO a criminal gang. *See* App.24–26. Although CAIR has argued that designation at least makes *it* a criminal

gang, whether a statute is civil or criminal turns on its "face," *Hudson*, 522 U.S. at 100, 104, not on its application to a particular party, *Seling v. Young*, 531 U.S. 250, 262–63 (2001); *United States v. Melvin*, 918 F.3d 1296, 1299 n.3 (11th Cir. 2017).

**B. CAIR received all the process it is due.**

"Due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (cleaned up). The D.C. Circuit, applying *Mathews*, has explained what process is required before designating an entity as a terrorist organization. *See Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 208–09 (D.C. Cir. 2001) (*NCRI*). The designated entities in *NCRI* were foreign entities, but the court held they were entitled to full due process protections because they had "entered the territory of the United States and established substantial connections with this country." *Id.* at 203. Those protections must include two things. First, the government must provide notice that includes the unclassified items on which the government relies. *Id.* at 208–09. Second, while "a hearing closely approximating a judicial trial" is not necessary, the government must afford an opportunity to be heard "at least in written

form." *Id.*; *see also HLF*, 333 F.3d at 163–64 (applying same standard to a domestic entity); *People's Mojahedin Org. of Iran*, 327 F.3d at 1242.

**1.** Florida complied with these requirements. The Chief provided CAIR with a notice of intent to designate it as a DTO. *See* App.105–111. That notice informed CAIR of the evidence on which the designation was based and of CAIR's right to file written objections, which CAIR did. *See* App.114–19. CAIR was thus given all the pre-designation process it was due, as the court below held. *See* App.17–20; *see also NCRI*, 251 F.3d at 208–09; *HLF*, 333 F.3d at 164.

The post-designation process available to CAIR likewise comports with the Constitution. The publication of the designation on October 6 triggered a 30-day window for CAIR to appeal the designation to state court. *See* FLA. STAT. § 943.03102(2)(f). Because the designation could not become effective during this time, *see* 52 Fla. Admin. Reg. at 3968, CAIR had an opportunity to secure preliminary relief before the designation took effect. *See* App.22. And even now, CAIR may petition to remove the designation "at any time." FLA. STAT. § 943.03102(3)(a).

**2.** CAIR's demand for more is irreconcilable with longstanding precedent for federal designations. CAIR contests the district court's

reliance on this precedent, contending that, when due process applies for federal designations, courts have deferred to the federal government's "power to conduct foreign affairs and commerce." Mot. at 35. But CAIR's only support for this point is a *First Amendment* holding, *id.* (citing *Reno*, 205 F.3d at 1137), and a decision applying the substantial evidence standard for review of an administrative record, *id.* (citing *Islamic Am. Relief Agency*, 477 F.3d at 734). CAIR gives no example of a court cabining what *due process* requires based on federal foreign-affairs powers. The D.C. Circuit cases noted above did not do so.[12]

CAIR also tries to downplay *NCRI* because the "private interest" there was a "small bank account." *Id.* at 32. But the court's explanation of what due process requires did not depend—in any way—on that fact. *See NCRI*, 251 F.3d at 208–09. And if there were still doubt, *HLF* would eliminate it, because that case involved a domestic organization—CAIR's former co-conspirator—whose designation resulted in the blocking of all its assets. 333 F.3d at 160. HLF, moreover, had substantial First

[12] The only exceptions: courts have invoked foreign affairs to justify reliance on secret evidence, *see People's Mojahedin Org. of Iran*, 327 F.3d at 1242, and the omission of pre-designation notice when notice could harm foreign policy, *see NCRI*, 251 F.3d at 208. But Florida provided CAIR pre-designation notice and did not rely on secret evidence.

Amendment interests—like CAIR, it "held itself out as the largest Muslim charitable organization in the United States." *El-Mezain*, 664 F.3d at 483. Yet the court applied *NCRI* anyway and rejected the need for a trial or cross-examination. *HLF*, 333 F.3d at 164; *see also Al Haramain*, 686 F.3d at 970, 984–86 (applying same standard to a designated domestic nonprofit whose mission was "to promote greater understanding of Islam").

Determined to escape this precedent, CAIR embraces the plurality opinion in *Jenkins v. McKeithen*, 395 U.S. 411 (1969). But CAIR's reliance on *Jenkins* is just another attempt to subject its designation to the rigors of criminal procedure. *See* App.19 n.7. What is more, *Jenkins* was decided seven years before *Mathews*, which supplies the governing standard for determining what due process requires. If *Jenkins* governed, then the federal designation regime, which courts have upheld under *Mathews*, would go down with Florida's. And, unlike in *Jenkins*, the "sole or predominant function" of designation is not to "expose and publicize" persons the State "finds guilty of wrongdoing," "without serving any other public interest." *Paul v. Davis*, 424 U.S. 693, 706 n.4 (1976) (quotation marks omitted) (cabining *Jenkins*). No, designation "ensure[s]

the safety . . . of the residents of [Florida]" by regulating entities that pose an "ongoing threat" to the State. FLA. STAT. § 943.03102(1)(a).

The post-designation judicial review process also complies with the Constitution. *See* App.21–22. If CAIR had appealed its designation, the state court would have reviewed the designation for procedural due process, essential requirements of law, and competent substantial evidence. *See City of Deerfield Beach v. Vaillant*, 419 So. 2d 624, 626 (Fla. 1982). CAIR disputes the adequacy of record review, but such review also governs at the federal level under the Administrative Procedure Act. *See NCRI*, 251 F.3d at 196–97; *Islamic Am. Relief Agency*, 477 F.3d at 732; *HLF*, 333 F.3d at 162.

Finally, CAIR's preliminary-injunction motion argued that the appeal is inadequate because the state court might not issue a *timely* ruling. *See* Supp.App.94–95. CAIR changes its argument here, claiming now that "even near-instant preliminary relief" in state court is not enough because its reputational harm occurred before the designation took effect, and even before the *vote*. Mot. at 34. This new argument is forfeited. *Access Now*, 385 F.3d at 1331. When CAIR made a similar move at the hearing, the court responded, "I didn't understand your brief to be

saying that." App.242 (45:23–24). In all events, CAIR's logic proves too much: it would require a trial-like hearing before the State could even announce an *intent* to designate—as CAIR admitted at the hearing—because the announcement alone might affect CAIR's reputation. App.243–45 (46:19–48:9). No case supports such a radical and unworkable rule, which would also invalidate the federal designation process. In fact, reputational harm alone is not even a protected interest. *Paul*, 424 U.S. at 712.

## III. Equitable Factors Do Not Support CAIR's Requested Relief.

Because CAIR is not substantially likely to succeed on the merits, it is not entitled to an injunction pending appeal. CAIR seeks to "relax" its burden on the merits, but the only binding precedent it cites involved a motion for a *stay* pending appeal. Mot. at 10. Injunctions pending appeal require a "significantly higher justification." *Respect Maine PAC*, 562 U.S. at 996 (quoting *Ohio Citizens*, 479 U.S. at 1313 (Scalia, J., in chambers)). Still, the equities point the same way. Enjoining enforcement of democratically enacted laws, absent a showing that they are unconstitutional, is manifestly contrary to the public interest; indeed, "the inability to enforce its duly enacted" laws "clearly inflicts irreparable

harm on the State." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018).

Even if CAIR were entitled to some relief, it asks that the Court do more than "enjoin only Defendants' enforcement of the DTO regime." Mot. at 4. It also requests the complete rescission of the published designation from the Florida Administrative Register. *Id.* To get that relief, CAIR would, at a minimum, need to prove that the *designation itself* is unlawful—not just the enforcement of related statutes. For all the reasons given above, CAIR has not done so. Nor has it even challenged certain other statutory provisions that incorporate the designation, which would effectively be nullified if the designation were rescinded. *See* FLA. STAT. §§ 1002.421(1)(t)(3)(c), (d), 1003.035.

The requested relief also exceeds the Court's equitable authority, which extends to "enjoin[ing] certain *state officials* from *enforcing* state laws"—not erasing the "challenged" provisions "themselves." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 43–44 (2021) (emphasis added). Although CAIR says that its relief would run against "the officials with relevant enforcement authority," Mot. at 5, those officials would be stripped of enforcement authority if CAIR were to succeed on the merits. CAIR admits that its real aim is to preempt citizen suits, *id.* at 4, but if

those suits come, CAIR may raise its "constitutional rights . . . as defenses," *Whole Woman's Health*, 595 U.S. at 49–50.

## CONCLUSION

The Court should deny CAIR's motion.

DATED: November 20, 2026

Respectfully submitted,

JAMES UTHMEIER
*Attorney General*

/s/ Charles J. Cooper
CHARLES J. COOPER
JOHN D. RAMER
NICOLE J. MOSS
RILEY W. WALTERS
JESSICA CRAINE

**COOPER & KIRK, PLLC**
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
ccooper@cooperkirk.com

/s/ David M.S. Dewhirst
DAVID M.S. DEWHIRST
*Solicitor General*
JASON J. MUEHLHOFF
*Chief Deputy Solicitor General*
TYLER E. GUSTAFSON
*Assistant Solicitor General*

**OFFICE OF THE ATTORNEY GENERAL**
**STATE OF FLORIDA**
The Capitol, PL-01
Tallahassee, FL 32399-1050
Tel: (850) 414-3300
david.dewhirst@myfloridalegal.com

*Counsel for Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this response contains 7,950 words, excluding the parts of the document exempted by Rule 32(f), in accordance with the Court's order granting Defendants-Appellees' motion to enlarge the word limit to 7,950 words.

This response complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook font.

Dated: November 20, 2026

*<u>/s/ Charles J. Cooper</u>*
Charles J. Cooper
COOPER & KIRK, PLLC
Telephone: (202) 220-9600
ccooper@cooperkirk.com

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on November 20, 2026. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: November 20, 2026

*/s/ Charles J. Cooper*
Charles J. Cooper
COOPER & KIRK, PLLC
Telephone: (202) 220-9600
ccooper@cooperkirk.com